UNITED STATES *v.* CLEVELAND & COLO. CATTLE CO.

*(Circuit Court, D. Colorado.* January 9, 1888.)

1. GRANT—EXTENT—CONFIRMATION OF PART—EFFECT.
Defendant claimed land as embraced in a grant of the government of Mexico to Vigil and St. Vrain, December 8, 1843, which was a part of the territory ceded by that government to the United States, by treaty of Guadaloupe Hidalgo, February 2, 1848. After the cession to the United States, congress (12 U. S. St. at Large, 71) confirmed this grant, to the extent of 11 square leagues, which embraced but a small part of what was claimed under the grant. The land claimed by defendant lies outside the 11 square leagues. *Held* that, while the act of congress is not conclusive upon the courts, it is very persuasive, and the confirmation of a part of the grant should be construed as a denial of the remainder by that body.

2. SAME—EXTENT—LIMITATION OF AREA.
A correct construction of the petition of Vigil and St. Vrain, for what is known as the "Las Animas Grant to the Governor of Mexico," and his grant of December 8, 1843, limits the application and grant to 11 square leagues to each claimant; and the fact that the justice of the peace, who was directed to give juridical possession of the land, delivered a much larger tract, will not divest the government of title to the excess.

3. PUBLIC LANDS—ILLEGAL POSSESSION—RIGHTS OF [THE GOVERNMENT—INJUNCTION.
When the government finds persons in possession of the public domain, under claim or color of title, it can proceed by injunction to restrain an improper use of the same, without first determining the rights of the parties in a court of law.

In Equity. On motion to dissolve an injunction.
Bill for injunction by the United States to restrain defendant, the Cleveland & Colorado Cattle Company, from fencing up, and improperly using, part of the public domain.
*H. W. Hobson,* Dist. Atty., for the Government.
*L. S. Dixon* and *J. W. Vroom,* for defendant.

BREWER, J. This case is before me now on a motion to dissolve a preliminary injunction. The bill was filed in June, 1886, and upon notice, and after hearing, the preliminary injunction was granted by Judge HALLETT. In the order granting such injunction, no leave was reserved to move for a dissolution after the filing of the answer; and when this motion was brought on for hearing my impressions were very strong that it was not good practice to entertain such motion, and I suggested to counsel on the argument whether, when an injunction had been granted upon notice, and after hearing, the true rule was not to let that preliminary injunction stand until the final hearing of the case, unless new matters had intervened since the granting of the injunction which compelled

its dissolution, or unless it appeared that, under no circumstances, could an injunction issue upon final hearing. So strong were my impressions in this direction, that I was tempted to overrule the motion at the conclusion of the argument. I now regret that I did not act upon these impressions, for it would have speeded the case. Of course, the decision of a motion is not *res adjudicata;* the matter may be again called to the attention of the court, so that it cannot be said that there is no foundation for this motion; and yet I cannot but think that such motions should not be encouraged, and that the better practice is that, when a preliminary injunction has been granted after a hearing of both parties, it should stand until the final disposition of the case, unless leave be given to press a motion for a dissolution after the filing of the answer; for, if under the bill a final injunction is possible, the *status* of the parties might be shifted backwards and forwards by, first, a preliminary injunction, then its dissolution, and, afterwards, by a final injunction. Of course, what I have said does not apply to a case where a preliminary injunction has been granted without notice, or to cases in which some new matters have intervened which so change the situation of the parties as to compel the discontinuance of the injunction, nor to a case in which it is evident that under no circumstances can any injunction go as the result of the final hearing. On the argument of this motion to dissolve, the entire merits of the controversy were discussed, and, while some of the questions may properly be passed to the final hearing, yet some matters ought to be decided, in view of the elaborate arguments made by counsel, and in order to advance the case as rapidly and as far as possible towards its final determination.

This bill is filed by the government to enjoin the defendant from fencing in a large portion of what is commonly known as the "Las Animas Grant." That a bill of this nature can be sustained must be conceded as settled, for this circuit at least, since the decision of Mr. Justice MILLER in the case of *U. S.* v. *Ranch Co.*, 25 Fed. Rep. 465, 26 Fed. Rep. 218, a case pending in the circuit court of Nebraska, and decided about two years ago. It becomes necessary, therefore, to trace the history of this grant in order to determine the condition of the title and the rights of the respective parties. The grant is within the territory ceded by the government of Mexico to the United States by the treaty of Guadaloupe Hidalgo, of date February 2, 1848, (9 U. S. St. at Large, 922,) by which treaty the fee of the soil passed to the United States government, subject to existing property rights, and by this is meant, of course, all vested rights, whether legal or equitable. An attempt was made by the Mexican government to have incorporated into the treaty a stipulation in respect to the subsequent completion and perfection of inchoate rights, but the United States refused to accept such stipulation, and the clause was stricken out, leaving the transfer of the fee subject simply to existing and vested rights of property, legal or equitable. The clauses of the treaty referring to these matters are the following:

"Art. 8. Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United

States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected on this account to any contribution, tax, or charge whatever. In the said territories, property of every kind, of Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans, who may hereafter acquire said property by contract, shall enjoy, with respect to it, guaranties equally ample as if the same belonged to citizens of the United States.

"Art. 9. The Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and, in the mean time, shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

Prior to the war with Mexico, and to this treaty cession, and on December 8, 1843, Vigil and St. Vrain petitioned for a grant. The petition and grant are in these words:

"SANTA FE, December 8, 1843.

"*Most Excellent Governor:* Cornelio Vigil, a resident of the demarcation of Taos, and Geran St. Vrain, a naturalized citizen and resident of the same, appear before your excellency in the manner and form best required by law, and convenient to us, and say that, desiring to encourage the agriculture of the country to such a degree as to establish its flourishing condition, and finding ourselves with but little land to accomplish the object, we have examined and registered with great care the land embraced within the Huerfano, Pisipa, and Cucharas rivers to their junction with the Arkansas and Animas, and finding sufficient fertile land for cultivation, an abundance of pasture, and water, and all that is required for a flourishing establishment, and for raising cattle and sheep, and being satisfied therewith, and certain that it is public land, we have not hesitated to apply to your excellency, praying you to be pleased, by an act of justice, to grant to each one of us a tract of land in the above-mentioned locality, protesting that in the coming spring we will commence operations which will be continued until the colony shall be established and settled, provided your excellency be pleased to grant it to us. We so request, and swear we do not act in malice.      CORNELIO VIGIL.

"GERAN. ST. VRAIN."

"SANTA FE, December 9, 1843.

"To the justice of the peace of the proper jurisdiction, who will give the possession referred to by the petitioners, as this government desires to encourage agriculture and the arts.      ARMIJO.

"DONACIANO VIGIL, Secretary."

On the second day of January, 1844, the justice of the peace gave juridical possession of the entire tract within the boundaries named in the petition. His certificate is in this language:

"In this district of Taos, on the second day of January, one thousand eight hundred and forty-four, I, Citizen Miguel Sanchez, justice of the peace of this demarcation, by virtue of what is ordered in the foregoing decree, proceeded to the land referred to by Citizens Cornelio Vigil and Seren St. Vrain, in the

foregoing petition; and being on the spot, with those in my attendance, and instrumental witnesses appointed for the purpose, we proceeded to the establishment of the *mounda (mahaneras,)* as described in said foregoing petition, and corresponding with the plat line, (north of the lands of Beaubien and Miranda.) At one league east of the Animas river a mound was erected; thence, following in a direct line to the Arkansas river, one league below the junction of the Animas and the Arkansas, the second mound was erected; and, following up the Arkansas to one and one-half leagues below the junction of the San Carlos river, the third mound was erected; thence, following the direct line to the south until it reached the foot of the first mountain, two leagues west of the Huerfano river, the fourth mound was erected; and, continuing in a direct line to the top of the mountain, to the source of the aforementioned Huerfano, the fifth mound was erected; and, following the summit of said mountain in an easterly direction until it intersects the line of the lands of Miranda and Beaubien, the sixth mound was erected; from thence, following the dividing line of the lands of Beaubien and Miranda, in an easterly direction, I came to the first mound which was erected. Closing here the boundaries of this grant, and having recorded the same, I took them by the hand, and walked with them, and caused them to throw earth, and pull up weeds, and make other demonstrations of possession, with which the ceremony was concluded; the boundaries being established without any claim being presented injuring any third party; as I, the aforementioned justice, in the name of the sovereignty of the Mexican nation, (which may God preserve,) gave to the aforementioned Cornelio Vigil and Seran St. Vrain the personal and perfect possession which they solicit, as a title to them, their children and successors, by which they are defended and protected; and I direct that they be not dispossessed, without first being heard and vanquished according to law.

"In testimony whereof, I signed with those in my attendance, and instrumental witnesses, who were Citizens Louis Lee, Manuel Martinez, and Juan Ortéga, who were present, and are residents of this district, to which I certify.          .          .                    JOSE MIGUEL SANCHEZ.

"Instrumental:  LOUIS LEE.
                        "MANUAL ANTO. MARTINEZ.
                        "JUAN ORTAGA.
"Attending:    JUAN RAMON VALDEZ.
.                        "PEDRO VALDEZ."

No further action seems to have been taken by the government, the departmental assembly, or the government of Mexico. After the treaty, for the purpose of determining the titles in the province of New Mexico, the government passed the act of July 22, 1854, creating the office of surveyor general of New Mexico, and by section 8 made this provision:

"That it shall be the duty of the surveyor general, under such instructions as may be given by the secretary of the interior, to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico; and, for this purpose, may issue notices, summon witnesses, administer oaths, and do and perform all necessary acts in the premises. He shall make a full report on all such claims as originated before the treaty of Guadaloupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same, under laws, usages, and customs of the country before its cession to the United States, and shall also make a report in regard to all pueblos existing in the territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the

nature of their titles to the land. Such report to be made according to the form which may be prescribed by the secretary of the interior, which report shall be laid before congress for such action thereon as may be just and proper, with a view to confirm *bona fide* grants, and give full effect to the treaty of 1848 between the United States and Mexico; and, until the final action of congress on such claims, all land covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provisions of this act."

In pursuance of this act, the holders of this grant made application to the surveyor general for a confirmation of the grant. Examination was had before him, and he made a report to the government, recommending its confirmation; this report, together with those in several other cases, came before congress for its action, and on June 21, 1860, it passed an act in respect thereto. 12 U. S. St. at Large, 71. This claim was numbered 17, in the list of claims, and section 1 of that act reads as follows:

"Section 1. That the private land claims in the territory of New Mexico, as recommended for confirmation by the surveyor general of the territory, and in his letter to the commissioner of the general land-office, of the twelfth day of January, 1858, designated as numbers one, three, four, six, eight, nine, ten, twelve, fourteen, fifteen, sixteen, seventeen, and eighteen, and the claim of E. W. Eaton, not entered on the corrected list of numbers, but standing on the original docket and abstract returns of the surveyor general as number sixteen, be and they are hereby confirmed: provided, that the claim number nine, in the name of John Scolly and others, shall not be confirmed for more than five square leagues, and that the claim number seventeen, in the names of Cornelio Vigil and Seran St. Vrain, shall not be confirmed for more than eleven square leagues to each of the claimants."

Thereafter the 22 leagues thus confirmed were surveyed and patented. The land in controversy lies outside of these thus patented, but is within the limits of the tract to which juridical possession was given as above stated. The confirmation, as seen, was of only 22 leagues, or about 97,-000 acres, while the tract claimed is over 4,000,000 of acres.

Now, without entering into an elaborate discussion of the Mexican laws in respect to land grants, let me notice two or three matters which influence my conclusions. In the first place, the political department of the government has determined the extent of this grant. After full investigation and consideration, it has, in effect, determined that it was a valid grant for only 22 square leagues. The act of 1860 can be regarded in no other light than as a decision by that department of the government. The petitioners were before it, insisting upon their claim to the full extent, and this act was its decision upon such claim. The fact that that act contains no express denial of the validity of the claim beyond the 22 leagues is immaterial. This confirmation as to part, is equivalent to a denial by congress of the balance; just the same as when one files a petition in the courts asking for a large sum, a judgment in his favor for a portion thereof is equivalent to a judgment against him for the rest. Section 4, properly construed, does not have the effect to leave as an unsettled question the claim of the petitioners for the balance of the tract. That section reads as follows:

"Sec. 4. That the foregoing confirmations shall only be construed as quit-claims or relinquishments on the part of the United States, and shall not affect the adverse rights of any other person or persons whomsoever."

That section means simply that congress does not determine, as between themselves, the rights of any adverse claimants to these 22 leagues, if any there be, or as to the present *status* of the title, leaving that matter to be settled by the courts. It does not, in terms or by any fair implication, reserve for further consideration the validity of the claim for the balance of the tract, or in any manner limit the force of the decision expressed in the first section; so that we have, as an important fact, the decision of the political department of the government against the validity of the title claimed by this defendant. It is doubtless true that the action of the political department is not conclusive upon the courts. It is their duty to construe treaties; to determine rights; and if there be any vested rights of property which the political department of the government refuses to recognize, such refusal will not prevent recognition and enforcement in the courts. At the same time, this action, though not conclusive, is very persuasive; it stands upon a higher plane than the mere construction by one party of his contract, and of its terms. It is true a treaty is in the nature of a contract between two governments, and subject to certain rules of construction, as contracts between individuals; but the action of the law-making power in determining the construction of a treaty, the extent to which rights under it are vested, has also some of the attributes of legislation. It is such governmental action as may not be wholly disregarded by the courts, and, although not absolutely binding, is, as I said, very persuasive.

Again, it is a familiar rule that grants are to be construed strictly in favor of the government, and against the grantee. I know of no reason why this rule, which is recognized as of universal force in this country, should not be similarly applied in respect to grants from other governments. Applying that rule to this petition and grant, it would seem that no more was intended to be conveyed than the 11 square leagues to each individual, which was the ordinary rule of Mexican grants. It is, of course, known that *empresario* grants were made of larger tracts, and it is doubtless true that there was a looseness and carelessness in the action of Mexican officials in respect to grants which have led to confirmation by this government in at least two instances of grants of much larger tracts. *Tameling* v. *Freehold Co.*, 93 U. S. 644; *U. S.* v. *Land-Grant Co.*, 121 U. S. 325, 7 Sup. Ct. Rep. 1015. Nevertheless, the general rule and the ordinary limitation was understood to be 11 square leagues to each individual; and, unless there be something in the proceedings which clearly indicate the intent to grant more, that ought to be considered the limit intended. The petitioners in this case evidently did not ask for the entire tract within the out-boundaries named in their petition, and probably did not contemplate an *empresario* grant. They say: "We have examined the land embraced within the Huerfano, Pisipa, and Cucharas rivers, and, finding sufficient fertile land for cultivation, an abundance of pasture and water, and all that is required for a flourishing

establishment, and for raising cattle and sheep." This suggests a per-sonal business,—a "flourishing establishment." They speak as if they were wishing the property for their own use; a place where they could raise cattle and sheep,—where they could carry on an individual business. The language does not contemplate the opening up of the land for settlement, the bringing in of colonists, and that filling up of the country with inhabitants which was the thought and purpose of *empresario* grants. And, further, they pray the governor to grant "to *each one* of us a tract of land in the above-mentioned locality." This clearly shows that they were not asking for the whole tract; and the fact that they ask for a grant to *each one*, instead of to the *two jointly*, discloses an evident purpose to get the 11 square leagues which might be given to each individual. Indeed, without resorting to the rule heretofore mentioned in respect to governmental grants, the fair import of this petition is that the extent of the application was for the familiar amount of 11 square leagues to each. It is true, near the close of the petition, they use the word "colony," and say that in the spring they will commence operations, which shall be continued until the colony shall be established. Of course, this word makes in favor of this an *empresario* grant; and yet its use ought not to be sufficient to overthrow the clear import of the petitioning clauses. So far as the language of the governor is concerned, it throws little light upon the question, being mainly a confirmation of the petition, in the form of a direction to the justice of the peace to give possession. And yet that which he does say makes in the same direction. It is not the bringing of settlers, the establishment of a colony, but the encouragement of agriculture and the arts, which is the purpose and consideration of the concession. If the matter rested here it would not seem that there could be any reasonable doubt as to the extent of the grant, as to what was applied for, and what was intended by both the petitioners and the government. The troublesome fact is that the justice of the peace, as appears by his certificate, gave juridical possession, not of 11 square leagues to each, but of the entire tract to both; and the act of this officer, it is insisted, is conclusive upon the government as the act of the proper official to designate on the land the boundaries of the tract conveyed. It is doubtless true that this act of juridical possession was very significant in the conveyance of lands under the Mexican law. It may be difficult to define the exact extent of the powers of this officer, but it would seem strange if an officer, of such an inferior grade, had power to enlarge a grant. It was for him to locate the grant; he could indicate its boundaries. Giving juridical possession was like the giving of seizin at common law. It was the manual transfer of possession; and, where the grant was of a fixed amount, but indefinite in location, doubtless the act of juridical possession was conclusive on the government as to the location of the grant. But to hold that when a grant had been made of 22 square leagues, a justice of the peace could, by the mere act of juridical possession, divest the government of the title to a thousand square leagues, is attributing to him powers which I do not think he possessed. Several cases have been decided by the supreme court in

which great stress has been laid on his action as designating and defining boundaries; but, until further advised, I shall hold that the power to designate and define boundaries, and give juridical possession, do not include the power to enlarge the extent of a grant. So, from both the action of the political department of the government, and from the construction of the proceedings of the Mexican government in respect to this grant, I am constrained to hold that no title passed to other than the 22 square leagues confirmed and patented. Nothing need be said in respect to the special matters set up in the answer, as to a lease and confiscation proceedings. These matters may be explained, qualified, or limited by the testimony; or, if not, it may well be that neither of them work an estoppel against the government.

· One other matter requires notice, and that is the argument so forcibly pressed upon me by counsel at the hearing. The defendant and its grantors have been in the possession for a length of time under what, as counsel say, must be conceded to be a claim and color of title. Under these circumstances, it was urged that equity will not interfere until the rights of the parties have been determined by proceedings at law. That, doubtless, would have been very persuasive against a preliminary injunction. But is it true in respect to the final determination of the case? Must the government, finding parties in possession of the public domain, even though under a claim and color of title, proceed to an action of law to establish its title, before restraining such parties from improper use of such land? The government has not simply the rights of a property owner in respect to these lands; it has all the powers of sovereignty. As the legal title is in the government, the presentation of that title casts upon the defendant the duty of establishing its equities. If a legal action were commenced no equitable defenses could be pleaded in the United States courts, and the defendant would be sent to its separate suit in equity. Practically, is any hardship done, or any rights of the defendant trespassed upon, if the government, in the first instance, comes into a court of equity, and invites the defendant then and there to a full and final determination of its rights?

· I have thus far considered this case without reference to the act of February 25, 1885. That act denounces inclosures of public lands, and, in terms, authorizes suits by injunction and otherwise; but that act does not purport to take away any jurisdiction from the circuit courts, or to limit their powers, sitting as courts of chancery. Its probable purpose and intent was to call the attention of the officers of the government to the increasing evil of fencing up the public domain, and perhaps, also, to vest jurisdiction in some courts which may not have had jurisdiction over such litigation. I think I shall say nothing more. I have not discussed all the questions that were suggested by counsel, nor have I enlarged upon the matters in respect to which I have spoken as fully as I should if this were the final hearing of the case. I have said what little I have said to indicate why I think that, upon the final hearing, the government may be entitled, under this bill, to a perpetual injunction. This is as far as I ought, or am at liberty now, to go. Whatever, upon the

facts now presented, would have been my conclusions as to the propriety of a preliminary injunction, the motion to dissolve ought not to be sustained, because, under the bill, it may be at the final hearing the government will be entitled to a perpetual injunction.

The motion to dissolve is overruled.