## CAMERON v. UNITED STATES.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF
ARIZONA.

No. 42. Argued November 14, 15, 1892. Dismissed December 19, 1892. Reinstated
February 6, 1893. Submitted March 6, 1893. Decided March 27, 1893.

A suit under the act of February 25, 1885, 23 Stat. 321, c. 149, to prevent
the unlawful occupancy of public lands, is a summary proceeding in the
nature of a suit in equity, which may be tried by the court without
the intervention of a jury, and is not governed by Rev. Stat. § 649.

The provisions of the said act of 1885 do not operate upon persons who
have taken possession of land under a *bona fide* claim or color of title.

Color of title exists wherever there is a reasonable doubt regarding the
validity of an apparent title, whether such doubt arises from the circum-
stances under which the land is held, the identity of the land conveyed,
or the construction of the instrument under which the party in posses-
sion claims title.

On the facts in this case, as detailed in the opinion of the court, *infra*, pp.
305–307, *Held*,

    (1) That the lands in question were not public lands of the United States,
    within the meaning of that term as used in the acts of Congress
    respecting the disposition of public lands;

    (2) That the defendant held them under claim or color of title, under
    an *expediente* of the Mexican government;

    (3) That in thus holding the court intimates no opinion as to the
    validity of the defendant's title.

THIS case was originally instituted by the filing of a com-
plaint by the United States in the District Court of the First
Judicial District of the Territory of Arizona, to compel the
removal by the defendant Cameron of a wire fence, by which
it was alleged he had enclosed about 800 acres of public lands
"without any title or claim or color of title, acquired in good
faith thereto, and without having first made application to
acquire title thereto, or any part thereof, according to law."
The proceeding was taken under an act of Congress of Feb-
ruary 25, 1885, 23 Stat. 321, c. 149, to prevent the unlawful
occupancy of public lands. The first section of the act reads
as follows: "All inclosures of any public lands in any State
or Territory of the United States, heretofore or to be here-

after made, erected or constructed by any person  .        to
any of which land included within the enclosure the person
.  .  .  making or controlling the enclosure had no claim or
color of title made or acquired in good faith, or an asserted
right thereto by or under claim, made in good faith, with
a view to entry thereof at the proper land office under the
general laws of the United States at the time any such
enclosure was or shall be made, are hereby declared to be
unlawful, and the maintenance, erection, construction or con-
trol of any such enclosure is hereby forbidden and prohibited;
and the assertion of a right to the exclusive use or occupancy
of any part of the public lands of the United States in any
State or any of the Territories of the United States without
claim, color of title or asserted right as above specified as to
enclosure, is likewise declared unlawful, and hereby pro-
hibited."

In his answer the defendant denied in general terms the
allegations of the complaint and, in an amendment thereto,
set up a Mexican grant of May 15, 1825, to one Romero and
other citizens of Santa Cruz; the death of Romero in 1873;
the purchase by Alfred A. Green of the interest of his heirs
in the grant; the sale by Green to one Rollin R. Richardson
of an undivided nine-tenths of Green's interest upon certain
terms and conditions expressed in the contract; the entry by
Richardson upon the land, claiming the right to the possession
thereof; the sale by Richardson to the defendant Cameron of
all his interest in the land, and the assignment of his contract
with Green, whereby the defendant became the equitable
owner of the said undivided nine-tenths interest, and "is in
the possession thereof and entitled to be in possession thereof."
The answer further averred that an application was then
pending before Congress for the confirmation of this grant;
that the same had been examined by the surveyor general of
Arizona, who had reported it to be a valid grant, and recom-
mended that it be confirmed to the representatives of Romero
and his associates to the extent of four square leagues, but
defendant claimed that it should be confirmed to the exterior
boundaries thereof, as set forth and described in the original

*expediente.* Upon the trial, the court found the issues in favor of the United States; decreed the enclosure to be of public lands, and therefore unlawful, and rendered a special judgment, in the terms of the act, that the fence be removed by the defendant within five days, and, in default of his so doing, that the same be des royed by the United States marshal.

Defendant thereupon appealed to the Supreme Court of the Territory, by which the judgment was affirmed. Defendant was then allowed an appeal to this court.

*Mr. Rochester Ford* and *Mr. James C. Carter* for appellant.

*Mr. Solicitor General* for appellee.

*Mr. W. H. Barnes* filed a brief for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case was originally dismissed upon the ground that the question at issue between the parties being the fact whether defendant had claim or color of title to the lands in question, acquired in good faith, there was no evidence of the value of such claim or color of title, even if the same were capable of pecuniary estimation, of which the court expressed a doubt. 146 U. S. 533.

The case was subsequently reinstated upon its being made to appear that the enclosed tract contained 1200 acres; that defendant had been engaged since 1883 in the business of grazing cattle upon this grant and the lands adjacent thereto; that his fence enclosed and controlled the only unappropriated water in a section of grazing country embracing not less than 100 square miles; that without such fence the use and control of the enclosed land and water would be of no use to him; that if he had not the ability to maintain the fence, the land and water would be at once seized and appropriated by other persons, and defendant's cattle driven and kept away; that he would be unable to conduct his cattle business in this sec-

tion; and that the possession, use. and occupation of such enclosure exceeds the value of $10,000. These facts make a wholly different showing, and the case is therefore properly before us on its merits.

1. A preliminary objection is made by the appellee to the consideration of the case upon the ground that the proceeding is in the nature of a common law action; that it was tried without the intervention of a jury, and without a stipulation waiving a trial by jury; that the Supreme Court of Arizona could not properly consider any of the matters raised by the bill of exceptions, nor can this court do so; that all the Supreme Court could do was to affirm the judgment of the District Court; and that all this court can do is to affirm the judgment of the Supreme Court of Arizona. By section 2 of the act of February 25, 1885, under which this prosecution was commenced, the district attorney was given authority "to institute a civil suit in the proper . . . Territorial District Court in the name of the United States, and against the parties named or described who shall be in charge of or controlling the enclosure complained of as defendants; and jurisdiction is also hereby conferred on any . . . Territorial District Court having jurisdiction over the locality where the land enclosed, or any part thereof, shall be situated to hear and determine proceedings in equity, by writ of injunction, to restrain violations of the provisions of this act. . . . In any case, if the enclosure shall be found to be unlawful, the court shall make the proper order, judgment or decree for the destruction of the enclosure in a summary way, unless the enclosure shall be removed by the defendant within five days after the order of the court."

It is a sufficient answer to this objection of the Government to say that this is not a common law action, but a summary proceeding more in the nature of a suit in equity, and that the decree provided by the act for the abatement of the enclosure is unknown to an action at common law as administered in this country. Proceedings by *assize of nuisance* and by writ *quod permittat prosternere* have been abolished by statute in England, and are now obsolete, if ever used, in this country.

3 Bl. Com. 221. In cases like the present the only common law remedy available to the United States would be an action of ejectment or trespass to oust the intruders. The proceeding contemplated by this act is more nearly analogous to the summary remedies provided for the enforcement of mechanics' liens considered by this court in *Idaho and Oregon Land Co.* v. *Bradbury,* 132 U. S. 509, or the special proceedings under the territorial statutes of Utah discussed in *Stringfellow* v. *Cain,* 99 U. S. 610; *Cannon* v. *Pratt,* 99 U. S. 619; *Neslin* v. *Wells,* 104 U. S. 428; *Gray* v. *Howe,* 108 U. S. 12; and in *Ely* v. *New Mexico &c. Railroad Co.,* 129 U. S. 291, appealed from the Supreme Court of Arizona. In these cases the validity of special statutory proceedings of this description was sustained, and in *Hecht* v. *Boughton,* 105 U. S. 235, it was held that under the act of April 7, 1874, 18 Stat. 27, c. 80, an appeal was the only proceeding by which this court could review the judgment or decree of a territorial court in a case where there was not a trial by jury.

The practice pursued in this case conformed to the territorial statutes of Arizona, which provide for a waiver by oral consent in open court of a trial by jury, in actions arising upon contract, and with the assent of the court, in other cases. The case is not governed by section 649 of the Revised Statutes.

2. The act of Congress which forms the basis of this proceeding was passed in view of a practice which had become common in the Western Territories of enclosing large areas of lands of the United States by associations of cattle raisers, who were mere trespassers, without shadow of title to such lands, and surrounding them by barbed wire fences, by which persons desiring to become settlers upon such lands were driven or frightened away, in some cases by threats or violence. The law was, however, never intended to operate upon persons who had taken possession under a *bona fide* claim or color of title; nor was it intended that, in a proceeding to abate a fence erected in good faith, the legal validity of the defendant's title to the land should be put in issue. It is a sufficient defence to such a proceeding to show that the lands enclosed were not public lands of the United States, or that defendant had claim

or color of title, made or acquired in good faith, or an asserted right thereto, by or under claim made in good faith, with a view to entry thereof at the proper land office under the general laws of the United States. As the question whether the lands enclosed by the defendant in this case were public lands of the United States depends upon the question whether he had claim or color of title to them, the two questions may be properly considered together.

Defendant justified under an *expediente* of the Mexican Government which appears to have been obtained in the following manner: On July 19, 1821, Don Manuel Bustillo applied to the governor intendente of Sonora and Sinaloa, to purchase at auction four square leagues of land for the raising of stock at the place named de la Zanja, "three square leagues of land (*tres sitios de tierra*) in the same *presidio* in which I reside and outside of the boundaries thereof and on the side of the north, and one square more (*un sitio mas*) for an '*estancia*' in the place of the '*cajoncito*' on the side of the east"; and prayed for a measurement of the lands by the proper officers, and for a valuation of the same. Upon this petition the intendente ordered a measurement of the lands, summoning the adjacent land owners, and appointing appraisers for the valuation of the land, publication to be made for thirty days for the purpose of soliciting bidders. The measurements were made (the details of which are fully set forth) from a central point named San Rafael, two leagues in each direction, *i.e.* to the four points of the compass, and monuments were put up on the four corners of the square as well as in the centre of the four exterior lines. All these monuments were placed at the time the lands were measured under the authority of the Government. The monuments included four leagues square, or sixteen square leagues.

Upon the completion of this survey, the lands were valued at $60 each for the three square leagues, for the reason that they contained permanent water, and the remaining square league at $30, for the reason that it contained no water except such as was furnished by wells. The land was thereupon put up at auction, and after some spirited bidding between Bus-

tillo and Romero was struck off to the latter at $1200, and the grant made to him by the proper officer in the name of the Mexican Republic, in which the land is described as four square leagues for the raising of cattle, (*cuatro sitios de tierra para cria de ganado mayor*,) included in the place called "San Rafael de la Zanja," situated in the jurisdiction of the *Presidio* of Santa Cruz, to Don Ramon Romero and other citizens (*vecinos*) interested. The grantees were also required to confine themselves within their respective limits, "which are to be designated by landmarks of stone and mortar," (*mojoneras de cal y canto*,) and were guaranteed the free enjoyment and quiet and peaceful possession of said lands.

A petition to the surveyor general of the Territory of Arizona was filed February 28, 1880, by the heirs of Romero for the confirmation of this grant, under an act of Congress of July 22, 1854, 10 Stat. 308, c. 103, as marked by the survey and monuments. See also act of July 15, 1870, 16 Stat. 291, 304, c. 292. The surveyor general reported that the grant should be confirmed to the extent of four square leagues and no more.

The court found that the fence maintained by the defendant was within the exterior boundaries of the grant, as said boundaries were recited as measured in the *expediente*, and outside the four square leagues measured by the surveyor general; that the defendant had succeeded to all the rights of Romero in the grant, and was and had been in possession of all the buildings on the four square leagues surveyed by the surveyor general and claimed, and had always claimed title to the possession of all the land within the exterior boundaries as measured in the *expediente*, claiming title thereto; "that the report of the said surveyor general upon said grant has never been finally acted upon by Congress; and that said claim and said report are still pending before Congress."

Upon proof of the foregoing facts, we think it clear that defendant established a color of title to the lands in question. In *Wright* v. *Mattison*, 18 How. 50, 56, it was said by Mr. Justice Daniel: "The courts have concurred, it is believed, without an exception, in defining 'color of title' to be that

which in appearance is title, but which in reality is no title. They have equally concurred in attaching no exclusive or peculiar character or importance to the ground of the invalidity of an apparent or colorable title; the inquiry with them has been whether there was an apparent or colorable title, under which an entry or a claim has been made in good faith. . . . A claim to property, under a conveyance, however inadequate to carry the true title to such property, and however incompetent might have been the power of the grantor in such conveyance to pass a title to the subject thereof, yet a claim asserted under the provisions of such a deed is strictly a claim under color of title." In that case a tax deed was held to convey a colorable title. And in *Gregg* v. *Sayre*, 8 Pet. 244, a deed purporting to convey a title in fee, which was fraudulent as to the grantor, but which the grantee had accepted in good faith, was held to have the same effect. In *Bryan* v. *Forsyth*, 19 How. 334, it was held that under an act of Congress making a general grant of land to the inhabitants of a village, when the survey was made and approved, by which the limits of the lot were designated, the title was such as to sustain an action of ejectment even before a patent was issued. To the same effect are *Pillow* v. *Roberts*, 13 How. 472; *Meehan* v. *Forsyth*, 24 How. 175; *Gregg* v. *Forsyth*, 24 How. 179; *Hall* v. *Law*, 102 U. S. 461; *Deffeback* v. *Hawke*, 115 U. S. 392, 407.

It is true there are cases to the effect that color of title by deed cannot exist as to lands beyond what the deed purports to convey; but where the deed is fairly open to construction as to what it does purport to convey, and at the time it was executed the land was officially surveyed according to the theory of the party claiming under such deed, it is manifest these authorities have no application. Color of title exists wherever there is a reasonable doubt regarding the validity of an apparent title, whether such doubt arises from the circumstances under which the land is held, the identity of the land conveyed or the construction of the instrument under which the party in possession claims his title.

While a grant of four square leagues of land in the place

called San Rafael de la Zanja, standing alone, would appear to have been a grant of a certain quantity of land, when it appears by the same instrument that the limits of the grant were to be designated by landmarks of stone and mortar; that such designation was actually made; and that juridical possession of the land was delivered in pursuance thereof; it is at least open to doubt whether it does not fall within the class of concessions by specific boundaries, as these grants are distinguished in *United States* v. *McLaughlin,* 127 U. S. 428. Under the view taken by the court below, that the grant was of only four square leagues of land, it was evidently a mere float, and defendant would have no color of title to any specific land until the same was designated, and would have no authority to maintain a fence around any part of the tract. In the case of *Fremont* v. *United States,* 17 How. 542, a grant of a tract of land known as Mariposas, to the extent of ten square leagues within the limits of the Sierra Nevada and certain rivers, was held to convey a present and immediate interest to so much land to be afterwards laid off by official authority. As no survey in that case was made, it was held to be a grant of quantity only. The same ruling was made with regard to the Moquelamos grant, which was described as "bounded on the east by the adjacent sierra." *United States* v. *McLaughlin,* 127 U. S. 428. See also *United States* v. *Armijo,* 5 Wall. 444; *Higueras* v. *United States,* 5 Wall. 827; *Alviso* v. *United States,* 8 Wall. 337; *Hornsby* v. *United States,* 10 Wall. 224.

It is evident that the lands in question were not public lands of the United States within the meaning of that term as used in the acts of Congress respecting the disposition of public lands. As early as 1839 it was held by this court, in *Wilcox* v. *Jackson,* 13 Pet. 498, that whenever a tract of land had once been legally appropriated to any purpose, it became from that moment severed from the mass of public lands. In that case there was a reservation of lands for a military post, for an Indian agency, and for the erection of a light-house, and it was held that the lands so reserved were not subject to entry at the land office. So in *Leavenworth, Lawrence &c.*

*Railway* v. *United States,* 92 U. S. 733, the doctrine of the former case was reaffirmed and held to apply to Indian reservations. And in *Newhall* v. *Sanger,* 92 U. S. 761, lands within the boundaries of an alleged Mexican or Spanish grant, which were *sub judice* at the time the Secretary of the Interior ordered a withdrawal of the lands along the road of a certain railroad, were held not to be embraced in a grant to the company. Speaking of such claims, it was said by Mr. Justice Davis, "that claims, whether grounded upon an inchoate or a perfected title, were to be ascertained and adequately protected. This duty, enjoined by a sense of natural justice and by treaty obligations, could only be discharged by prohibiting intrusion upon the claimed lands until the opportunity was afforded the parties in interest for a judicial hearing and determination. It was to be expected that unfounded and fraudulent claims would be presented for confirmation. There was, in the opinion of Congress, no mode of separating them from those which were valid without investigation by a competent tribunal; and our legislation was so shaped that no title could be initiated under the laws of the United States to lands covered by a Mexican or Spanish claim, until it was barred by lapse of time or rejected." It was urged in that case that the reservation could only be of lands "lawfully" claimed, but it was said expressly that there was no authority to import the word "lawful" into the statute in order to change its meaning, and that the act in question expressly excluded from preëmption and sale all lands covered by any foreign grant or title. In *Doolan* v. *Carr,* 125 U. S. 618, it was held that, if the grant was of a specific quantity within designated outboundaries containing a greater area, only so much land within the outboundaries as was necessary to cover the specific quantity granted was excluded from the grant to the railroad companies. Indeed, the cases in which these rules have been applied to lands reserved for any purpose whatever are too numerous even to require citation. In this case there is an express finding that the report of the surveyor general limiting the grant to four square leagues has never been finally acted upon by Congress, and that the claim

and report are still pending before Congress; in other words, that the claim is *sub judice.*

It is true that in the act of July 22, 1854, 10 Stat. 308, c. 103, establishing the office of surveyor general for New Mexico, (then including Arizona,) there is a provision which is omitted in the act of July 11, 1870, 16 Stat. 230, c. 246, establishing the same office for Arizona, that "until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the Government, and shall not be subject to the donations granted by the previous provisions of this act"; but as the sundry civil appropriation act of that year (16 Stat. 291) provides that the surveyor general of Arizona shall have all the powers and perform all the duties enjoined upon the surveyor general of New Mexico, there could have been no intention to change the settled policy of the Government in this particular.

We do not wish to be understood as intimating an opinion as to the validity of defendant's title. There is an apparent discrepancy between the terms of the grant and the survey that was made in pursuance of it which may perhaps be susceptible of elucidation.

But we think that defendant has shown color of title to the land enclosed, and

> *The judgment of the Supreme Court of Arizona must, therefore, be reversed, and the case be remanded with directions to dismiss the petition.*

MR. CHIEF JUSTICE FULLER dissented from the opinion and judgment.