UNITED STATES v. JETER.

(Third Division. Knik. July 23, 1915.)

No. S/69.

1. PUBLIC LANDS ☞39(4)—INJUNCTION—MANDATORY—TOWN-SITE WITHDRAWAL.

   The Chugach Forest Reserve, including the land in controversy, was declared February 23, 1909. On May 8, 1910, the defendant settled on the land claimed by him in this action. He made application to enter the land, but the entry was never consummated, and on April 21, 1914, the land was included in executive order of withdrawal No. 1, for town-site purposes, under authority of the act of Congress approved March 12, 1914 (38 Stat. 305, c. 37), for the construction of the government railroad. *Held*, defendant had not acquired any vested right in the land, and, the executive withdrawal being valid, the defendant is a trespasser, and may be removed from the land by mandatory injunction.

2. PUBLIC LANDS ☞8—TRESPASSER—INJUNCTION.

   Where a trespasser occupies public lands, he may be removed by mandatory injunction.

The Chugach Forest Reserve, covering the land in controversy in this case, was created as provided by law the 23d day of February, 1909. On May 8, 1910, the defendant, Jeter, according to his own testimony, first went upon this land. On October 20, 1910, he put up a small cabin, since which time he claims to have resided upon the land, leaving, however, at intervals to earn money to enable him to continue to live thereon. He also claims to have done some clearing and cultivated a small area of the land, and that the value of all the improvements placed by him upon said premises is the sum of $1,000.

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

He testifies that he had interviews at different times with special agents of the Interior Department and the Forestry Service, and that he applied to the district forester to locate said land as a homestead; that in May, 1913, he applied to the United States land office at Juneau, Alaska, to file upon said tract as a homestead, but was informed by them that the same had not been listed or platted or eliminated from said forest reserve, and they could not accept any filing thereon. He claims that some of the agents of the Land Department with whom he talked here in Alaska assured him of their willingness to see him acquire said land as a homestead; one of them, after some investigation of the matter, saying that he "now passed him up to the Secretary of the Interior."

The situation is clearly set forth in the letter from the district forester to defendant's attorney, dated November 12, 1914, as follows:

"Your letter of November 10 is received. The following is a copy of the forester's letter of October 8, 1914, commenting on Mr. Jeter's application No. 35, filed February 7, 1911, under the act of June 11, 1906, for '160 acres on northerly side of Ship creek, commencing at stake near mouth of creek, 320 rods easterly following meanderings of creek to Cor. No. 2, thence N. 80 rods to Cor. No. 3, thence 320 rods W. to Cor. No. 4, thence 80 rods S. to beginning (unsurveyed).'

"I have carefully examined the additional report and map transmitted in this case, and find nothing in the statement of facts presented which will now justify listing the tract sought by Mr. Jeter, located within the executive order of withdrawal No. 1, for Alaska town sites issued April 21, 1914.

"It appears that Mr. Jeter settled thereon without due authority May 1, 1910, and subsequent to the creation of the National Forest by proclamation of February 23, 1909. Such settlement created no valid claim. His continued occupancy and improvement of the land illegally appropriated conveyed no valid right therein, even though such occupancy and improvement were condoned by the forest officer in consideration of the possibility of its being listed to Mr. Jeter under the act of June 11, 1906. He was not willing to accept the listing survey by metes and bounds made by the forest officer. He desired to have the matter of listing held in abeyance to await the General Land Office survey, in order that the tract might be listed by legal subdivisions. But for such delay, on his own motion, the tract could have been listed with the Secretary of the Interior, and Jeter's preference right of entry acquired prior to the withdrawal by executive order, which has intervened and now defeats the acquisition of such right.

"Mr. Jeter's application was finally rejected by this office by letter of October 6, copy of which is inclosed.

"Mr. Jeter's homestead application has been a difficult one to handle, since it has been impossible to adjust the boundaries of his claim in such a way that it would be satisfactory to him and yet come within the requirements of the law."

In effect, all of the efforts of the defendant to make a valid homestead filing or location of said premises amounted to no more than an attempt to buy land which the owner was not yet ready to sell.

W. N. Spence, U. S. Dist. Atty., of Valdez, for the United States.

Maurice D. Leehey and L. V. Ray, both of Seward, for defendant.

BROWN, District Judge. Something was said at the hearing of this case with regard to the delay, either by the Secretary of the Interior or the Secretary of Agriculture, or some one authorized to act in the matter of eliminating lands from national forest reserves, which is very prejudicial to the defendant. This may all be true, and still the defendant is in no position to claim a legal or valid right to said land until such time as the officers authorized by law to dispose of said land performed the various administrative acts delegated to them by the public land laws of the United States.

During the '80's, and up to the late '90's, the public land laws of the United States were very much more liberally, or, as may be said, loosely, administered. To such an extent was this true that the settlers upon the public domain in the Western states and territories came to feel and believe that they had almost a vested right in and to all public lands upon which they might settle or establish a physical possession. When the most of the public lands were disposed of, and land became scarcer, the policy of the government became stricter. National forest reserves were established, and the old-time settlers and squatters upon public lands, or those who had lived in the newer states and territories, desiring to make such settlements or locations, felt very much aggrieved, as though their personal liberties and rights had been infringed and invaded. During the past 30 years I have had an intimate personal knowledge of this transition, and understand and appreciate fully the viewpoint of the "old-timer," especially those in a mining country, long used to the free appropriation of mining claims by right of discovery and location only.

This may have nothing to do with this case, any more than it serves to illustrate the position of the defendant, who strenuously insists upon his right, as against the government and against anybody else, because he settled upon and took physical possession of a certain tract of public land. Because the government for many years was very lenient in administering public land laws, and even permitted acts of occupancy and trespassing upon the public lands without objection, is no more reason why one could acquire a valid or legal right thereto, without full compliance with the public land laws, than that a guest in the house of a tolerant and generous host should, after a long period of entertainment, feel that he was unjustly treated by being requested to leave.

The said Chugach National Forest Reserve having been duly created in February, 1909, no homestead filing could be made within the limits thereof at any time thereafter without complying with the rules and regulations of the Secretary of Agriculture, which are provided for in the act of Congress approved June 11, 1906 (34 Stat. 233, c. 3074 [U. S. Comp. St. 1916, § 5162]), as follows:

"That the Secretary of Agriculture may in his discretion, and he is hereby authorized, upon application or otherwise, to examine and ascertain as to the location and extent of lands within permanent or temporary forest reserves, except * * * which are chiefly valuable for agriculture, and which, in his opinion, may be occupied for agricultural purposes without injury to the forest reserves, and which are not needed for public purposes, and may list and describe the same by metes and bounds, or otherwise, and file the lists and descriptions with the Secretary of the Interior, with the request that the said lands be opened to entry in accordance with the provisions of the homestead laws and this act."

The defendant does not claim to have complied with the rules issued by said Secretary of Agriculture, which are found on page 36 of volume 36, Land Decisions, as follows:

"Regulations Governing Applications under the Act of June 11, 1906.

"U. S. Department of Agriculture, Forest Service.

"1. Applications must be made upon this form (a), signed by the applicant, and mailed to the forester, Washington, D. C.

"2. Applicants will secure preference in the order of the receipt of their applications, unless the lands were occupied by bona fide settlers prior to January 1, 1906, in which case the settlers have the preference.

"3. The fact that an applicant has settled upon the land will not influence the decision with respect to its agricultural character. Settlement after January 1, 1906, and in advance of the opening by the Secretary of the Interior, is not authorized by the act, confers no rights, and will be considered trespass.

"4. If for any reason an application is rejected or withdrawn, application may be made for another tract. Applicants entitled to a preference right under the act will be permitted to occupy the land applied for by them upon making application to the forest supervisor.

"5. Settlement and entry under the act are within the jurisdiction of the Secretary of the Interior, who will determine the preference rights of applicants."

That is to say, the defendant, while he claims to have made his application for permission to make homestead entry within said forest reserve, does not claim to have ever received permission so to do, or that his application was granted; on the contrary, his own testimony shows that, as above stated, in May, 1913, he applied to the land office at Juneau, and his application was refused, whereas, had the said land been open to homestead settlement, in the manner provided by law, his application would have been received, and he thereby have initiated a valid right, which could not have been taken from him by the decision of any court, or he be deprived of the said land, except by due process of law, such being his constitutional right. But, as the case stands, he is and has been, during all of these years, a mere trespasser, permitted to remain on said land only by sufferance, and never has acquired any valid or legal right. He has merely been a suitor, seeking to acquire or purchase said land.

The regulations of the Secretary of Agriculture under said act of June 11, 1906, have all the force and effect of law, as has been expressly held by the Supreme Court of the United States in the case of United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563.

The complaint sets out that the President, under the act of Congress approved March 12, 1914 (38 Stat. 305 [U. S. Comp. St. 1916, §§ 3593a–3593d]), entitled "An act to authorize the President of the United States to locate, construct, and open railroads in the territory of Alaska, and for other purposes," set apart and reserved a tract of land for railroad terminal purposes, within which is included the land claimed by defendant herein. Even if this was not alleged or proved, the United States could still maintain this action to remove defendant

from said land, although it had no pressing use for said land, it being in a national forest reserve and therefore not subject to settlement or sale. But in this case it appears that the United States has undertaken a very important enterprise, to wit, the building of a railroad from tidewater in Alaska to the coal fields, and thence into the interior of the country, and has urgent need of this land, and that defendant's occupation of said premises is necessarily an impediment and obstruction to the operations of said railroad building, which is now in active operation.

The defendant has made claims for rental and damages for the use of said land, upon which the United States is now conducting its railroad operations.

The remedy sought here, that of mandatory injunction, has been sustained and upheld by decisions of the Supreme Court of the United States, which is the highest law in our land. See the case of Light v. U. S., 220 U. S. 523, 31 Sup. Ct. 485, 55 L. Ed. 570; also U. S. v. Cattle Co. (C. C.) 33 Fed. 330; U. S. v. Henrylyn Irr. Co. (D. C.) 205 Fed. 970; U. S. v. Brighton Ranch Co. (C. C.) 25 Fed. 465; U. S. v. Brighton Ranche Co. (C. C.) 26 Fed. 218.

Counsel for the defendant insists that, under the authorities, a proceeding of this kind is sustained only in pursuance of some federal statute with regard to fencing public lands, etc. In the case of United States v. Bernard, 202 Fed. 728, 121 C. C. A. 190, a case decided by the Circuit Court of Appeals for the Ninth Circuit, which is the appellate court for all Alaska cases, the court says:

"But the appellees deny that the court below, in entertaining jurisdiction of the case at bar, was exercising the general powers of an equity court, or that it was authorized to grant any of the incidental relief which ordinarily pertains to suits in equity, and they contend that the jurisdiction was special and limited, and measured by the express terms of Act Feb. 25, 1885, c. 149, 23 Stat. 321 (U. S. Comp. Stat. 1901, p. 1524), and that, since that statute confers jurisdiction only to grant injunctions to restrain violations of the act and to order the destruction of inclosures, the court was powerless to grant other relief such as it might grant in an ordinary suit for an injunction.

"There can be no question that, irrespective of the act of 1885, the United States has all the common-law rights of an individual in respect to depredations committed on the public lands. In Camfield v. United States, 167 U. S. 518–524, 17 Sup. Ct. 864, 867 (42 L. Ed. 260), Mr. Justice Brown said: 'It needs no argument to show that the

building of fences upon public lands with intent to inclose them for private use would be a mere trespass, and that such fences might be abated by the officers of the government, or by the ordinary processes of courts of justice.' And he observed that, if the act of February 25, 1885, be construed as applying only to fences actually erected upon public lands, it was manifestly unnecessary. In Cameron v. United States, 148 U. S. 301, 13 Sup. Ct. 595, 37 L. Ed. 459, the court said that the suit provided for by the act was in the nature of a suit in equity.

"In United States v. Brighton Ranche Co. (C. C.) 26 Fed. 218, the defendant had built a fence partly on its own land, and partly on land belonging to the government, and inclosing a tract of several thousand acres. The suit was in equity, to compel the defendant, by mandatory injunction, to remove its fence from the government land, and thus leave the inclosed government land free from all obstructions to approach, the court said: 'The question made is whether the government can come into a court of equity and avail itself of the summary remedies given by such a court. We are of the opinion that it can; and, whether the act of the defendant comes within the technical definition of purpresture or that of a public nuisance, we are of the opinion that the government can come into a court of equity, and by its orders have an end put to this trespass on the public rights. * * * We think, too, an action of injunction is the appropriate remedy, and that an action of ejectment would not furnish full protection to the government.'

"This was held by Judges Brewer and Dundy on exceptions to the answer. On the final decision of the case (United States v. Brighton Ranch Co. [C. C.] 25 Fed. 465) Mr. Justice Miller said: 'I am of opinion that the United States is entitled to its injunction, mandatory as to so much of the fence complained of as exists, and prohibitory as to building any future fences, so far as either of them comes within the following principles: (1) There exists no right in the defendants to build any fence on the lands of the United States. (2) All lands are for this purpose lands of the United States, so long as the legal title remains in the United States. (3) It is the right of the United States, and its duty, to protect all such lands from this misuse in cases where there have been any kind of entries, whether of pre-emption, homestead, or private entry, though the purchase money be paid, so long as the legal title remains in the United States, except where these latter parties build their own fences, or give express license to others to do it. In these cases it holds the title in trust, and can maintain this bill to remove the fence or prevent its erection.' "

It follows, therefore, that the relief prayed for by plaintiff must be granted.

Mandatory injunction will be issued requiring the defendant forthwith to remove from the said land both himself and all structures erected by him thereon, and upon his failure to do

5 A.R.—21

so, that the United States marshal for the Third division, or any deputy of said marshal, be commanded to forthwith remove said defendant and all structures placed by him on said premises.