Mrs. Mary McL. Jones et al. *v.* Mayor and Board of Aldermen of City of Jackson.

[61 South. 456]

1. Public Lands. *Donation for seat of government. Effect. Commons. Promenade. City library. Laws* 1838, *page* 269.

Where under Laws 1838, page 269, so providing, certain officers were appointed commissioners to cause to be made a survey and plat of all unsold lots belonging to the state, embraced in the donation made by the general government to this state for a seat of government, including the blank squares, and to sell the same "except such blank squares as the said commissioners, with the governor and commissioners of public buildings shall select, as necessary to be reserved as commons, for the health, ornament, and convenience of the city of Jackson, and

104 Miss. 29

providing that a plat should be made and recorded. And a map was accordingly made showing the reserved commons designated as a promenade. This was not a grant or donation of the fee to the city of Jackson but was a dedication of the reserved square to the use of the public and is irrevocable, so far as the state is concerned.

2. SAME.

Under such dedication the word "commons" meant a piece of ground left open for common or public use for the convenience and accommodation of the inhabitants of the town and the town "promenade" a walking place for the public; and the city of Jackson has no authority to use such square for the construction of a public library.

APPEAL from the chancery court of Hinds county.
HON. G. G. LYELL Chancellor.

Bill by Mrs. Mary McL. Jones against the city of Jackson and board of mayor and aldermen of the city of Jackson in which the state intervened. From a judgment for defendant, plaintiffs appeal.

The facts are fully stated in the opinion of the court.

*Easterling Potter* and *Greaves,* for appellants.

The only case we have been able to find holding against us is the case of *Spires* v. *City of Los Angeles* et al., 150 Cal. 64, Am. Eng. Ann. Cases, 465. In this case, "The plaintiff, a resident taxpayer of the city of Los Angeles, and the owner of certain property abutting on what is claimed to be a public park in said city, brought this suit by injunction against the city of Los Angeles, the mayor and common council, the members of the board of park commissioners of that city, to restrain them from erecting a public library on a tract of land owned by said city of Los Angeles bounded by Hill, Sixth and Olive streets in that city and known as Central Park, on the ground, that the city as owner of said property, had dedicated it to the use of the public for park purposes, and that such purpose would not permit erection therein of a public library building.

The Central Park in question is six hundred by three hundred and twenty feet in size and it was proposed by the municipal authorities to use a space in the center thereof, one hundred by one hundred and fifty feet, upon which to erect a public library.

We contend that this case is utterly unsound. We will call the court's attention to the fact that among the parks mentioned in support of the California court's theory in that case is Central Park in New York City, the opinion says: ''To instance—in Central Park in New York City there is a museum of natural history and a metropolitan art museum.''

How on earth because in New York City a museum of natural history and a metropolitan art museum is placed on a broad expanse of ground, consisting of more than one hundred acres, can it be claimed to justify a court in holding that the placing of a brick structure one hundred feet by one hundred fifty feet (a library), on a park, six hundred feet by three hundred and thirty feet, is the proper use of such ground?

There are many things that might be of perfect legitimate use in the great field used for parks in larger cities that would be absolutely inconsistent with the uses of a park square and yet interfere with the uses and purposes of such as a park.

Then again, the California court justified itself in holding that the erection of a public library on a small public park in controversy was properly used by citing the case of the *Attorney-General* v. *Sunderland,* 2 C. H. D. 434. In that case the park in question was twenty-five acres. The court in that case held that a small portion of it could be used for a museum, library or conservatory and that such use would not be inconsistent with its use for park purposes. We contend that the very case upon which the case of *Spires* v. *Los Angeles* is based shows that the conclusion reached in that case was wrong, because it may be the proper use of a very large park to place therein a

museum or library or conservatory cannot justify, we contend, the use of a public square for such purposes. In a park consisting of twenty-five acres, as the park in the Sunderland case, or in a park consisting of one thousand acres, as Central Park in New York City, there is enough room to build a library and at the same time leave sufficient space for the recreation and enjoyment of the public.

It is our contention that the main use of a park, be it a small park or a large park, is a place for air, exercise, amusements and outdoor recreation and that a park should not be used for any purpose that will impair its usefulness, as a place for amusement, exercise and recreation, the purpose of its creation.

It is our contention that the building of a large permanent structure in the center of a park as small as Smith's Park and placing therein a library would practically destroy it for park purposes and ought not to be permitted. As an illustration of whether the use of a park—of the one in question—as a public library is the proper use we call your attention to the natural instincts of man, when the suggesting of placing a library in this park is first mentioned. We will venture to say that when this proposition is mentioned for the first time to ninety-nine persons out of a hundred, the very suggestion shocks them. It occurs to them on first blush that such use is absolutely inconsistent with the use of such as a park, but on the other hand when it is suggested to anyone that a band stand, statuary, fountains or the like be erected in the park, the suggestion meets with ready approval in the minds of persons to whom the suggestion is made, because it occurs to anyone that such use of a park is a legitimate and proper use.

The only case, so far as we have been able to discover, holding that the building of a public library was the proper use of a public square is *Spires* v. *City of Los Angeles, supra,* and although it is true that we have found

no such case that holds directly that such use of a public square for a public library is an improper use, it is our contention that the case of *Rowzee* v. *Pierce,* 75 Miss. 846, 65 Am. St. 625, settles the question so far as our state is concerned; for while a library building was not the character of the building proposed to be erected on the park in question in that case, yet the court held that the erection of a building of any kind would be a perversion from the use for which it was intended. In that case a park in the town of Pontotoc dedicated ''only for public use as an ornamental park, subject to such regulations as they make for the purpose of fencing and ornamenting the same, and keeping the same in good order, and preventing nuisances or anything tending to subvert the before-declared object of the donors of money to purchase the same.''

The board of mayor and aldermen of the town of Pontotoc had begun the construction of the school building on this lot. The court in deciding this case did not adopt the theory of the California case, that the test of whether a building should be erected in a public park was the use of that building; that is, whether the building was to be used for the enjoyment of all the public or whether it was to be used for only a special class. But the court in the Rowzee case adopted another course of reasoning. It could have stated that the school will only be used by a certain class, to wit, those between five and twenty-one years of age, and held on that ground that such use was not authorized by the dedication. But our court adopted an entirely different line of reasoning, a much truer line of reasoning, we contend, and that is that no building at all can be placed on ground dedicated to park use.

In this opinion the court cited the case of *Rutherford* v. *Taylor,* 38 Mo. 315 and said as follows: ''It is held in *Rutherford* v. *Taylor, supra,* that buildings could not be erected in a public square.''

And also, quoting, cites the case of *Church* v. *City of Portland,* 6 L. R. A. 259, and quoted the following lang-

uage from that case: "Using land to erect a public building thereon is not using it for ornamental purposes, however grand or magnificent the structure erected may be. It devotes the land to a useful purpose; but it certainly is not using it for an ornamental one.

Then in the case against the Mayor, etc., 33 N. J. L. 13, 97 Am. Dec. 698, cited in the *Rowzee* v. *Pierce,* our judges quote as follows: "The word 'square' on this plat of ground, indicated a public use, either for purposes of a free passage or to be ornamented and improved for grounds of pleasure, amusement, recreation or health. That is the proper and natural meaning of the term and its ordinary and usual significance." And after quoting these decisions, which all emphasize the idea that a park should be kept open and that public buildings should not be erected thereon, our court sums the matter up in its own language as follows:

"It must thus be clear that none of the objections interposed by the demurrer are available as against a bill of this particular nature. It certainly cannot be impossible for the town of Pontotoc to raise funds with which to make this property a public ornamental park, as was originally intended. The town may not be able, and it might not be desirable, to incur any great expense towards this end; but surely the expense would be small which would be required to properly keep it in order, and use it as an open, public, ornamental park, devoted to the amusement, recreation and health of the citizens.

We, therefore, urge that our court is committed to that line of reasoning which holds that no permanent structure can be erected in a public park but that such parks should be left open and devoted to the amusement and recreation and health of the citizens. And we contend that the principle is the same whether the building proposed to be erected is a schoolhouse or library.

The case of *Riggs* v. *Board of Education,* 27 Mich. 262, is not authority in this case, for under the dedication the

land used for a park in that case was dedicated "for such uses as city council might provide." The building of a library under a dedication as broad as this was, of course permissible because the absolute discretion in the use of the property, was in the city council.

We call the court's especial attention to the elaborate note in the case of *Cardinal* v. *Crocker,* 25 L. R. A. (N. S.) 908, and in the case of *Spires* v. *Los Angeles, supra,* we call this court's attention to the fact that the language in the dedication of the land in that case was very broad. The land was dedicated to the municipality of Los Angeles "as a public place forever for the enjoyment of the community in general."

Quoting from the text of 9 Am. & Eng. Ency. of Law (2 Ed.), p. 26, "An unrestricted dedication as a public square implies that the land is to be kept open and free from building. It may, however, be surrounded with a fence and improved and ornamented, and roads and walks laid out across it." Also, "The question what buildings may be erected in or facing upon parks depends primarily upon the purpose of the dedication. Where such dedication is made for the purpose of a park, the erection of any buildings thereupon is unauthorized, as opposed to the express or implied purpose of the dedication, and such buildings constitute a public nuisance, which may be abated by anyone aggrieved. But where premises have been provided for the purpose of public walks or pleasure grounds, the erection of a conservatory, museum, or a public library may be conducive to the purpose for which the premises were acquired, though the erection of a town hall or a school of art would be subversive of such purpose." 21 Am. & Eng. Ency. of Law. (2 Ed.), p. 1072.

*Frank Johnston,* for appellants.

I respectfully insist to the court, in behalf of the state, that there is no principle of law or rule of statutory con-

struction of grants or dedications of property that can possibly be treated as authority for the proposition that section 1, of the Act of February 16, 1838, is a grant of this property by the state of Mississippi to the city of Jackson.

If it is. a dedication at all, it is a dedication to the state and in the use of the state, which shows that it is a solecism to call it a dedication at all, for a dedication for this purpose would not affect in the slightest degree the absolute dominion of the state as to its title and ownership in the property.

I will refer the court to some of the decisions on the subject of reservations in order to show that this cannot operate as a grant or decision. If it is a reservation, it is a reservation expressly and exclusively for the benefit of the grantor which is the state.

"A reservation in a deed is something created out of the granted premises by force and effect of the reservation itself, as an easement out of the land granted, or rent out of premises devised." *In re Narragansett Indians,* 40 Atl. 347, 355; *Elliott* v. *Small,* 29 N. W., 158, 159.

Again it is defined thus: "A reservation is a proviso in a deed which reserves to the grantor some new right or interest in the thing granted, not before existing in him, operating by way of an implied grant. If it does not contain words of inheritance, it will only give an estate for the life of the grantor." *Engel* v. *Ayer,* 27 Atl. 352, 85 Me. 448.

And again in *Winthrop* v. *Fairbanks,* 41 Me. 307, it is said: "A reservation is a proviso in a deed creating some new right or interest in the. thing granted, and reserving the same for the benefit of the grantor."

In *Karmuller* v. *Krotz,* 18 Iowa, 352, a reservaton is defined as. "Something issuing or coming out of the thing or property granted, and not a part of the thing itself, and must be to the party or grantor executing it, and not to a stranger."

Upon the same point, I refer the court to *Brost* v. *Empire,* 5 N. Y. (I Sled.) 33 and 38.

I call the attention of the court to the text of the American & English Ency. of Law on the subject of a reservation: "A reservation is a clause in a deed, or other instrument of conveyance, by which the grantor creates and reserves to himself some right and interest or profit in the estate granted which had no previous existence as such, but is first called into being by the instrument reserving, such as rent or an easement." 24 Am. & Eng. Ency. of Law, 858.

And it is defined in Cyc. as "that which is reserved, kept back, or withheld from a grant." 34 Cys. 1638.

In the case of *McConnel* v. *Wilcox,* 2 Ill. (I Scammon's) 344, 359, the court said: "The word 'reservation' does not imply an absolute disposition of the lands in all cases, but a withholding them from some other disposition, such as sale, or for the use of schools, and other objects. While on the contrary, the term 'appropriation' would imply most clearly a setting apart, or application to some particular use."

The language of this statute which I have already quoted is: "Except such blank squares as the commissioners shall select."

Judge Isaac C. Parker in the Western District of Alabama in the case of the *United States* v. *Payne,* 2 McCreary, 298 and 301, in a case involving the reservation of certain property out of public sales, held expressly that the reservation does not operate as a grant or a dedication or appropriation. In that case, there was a reservation out of the sales of public lands for the purpose of an Indian reservation. There was also a general act of congress providing for the general sales of public lands and the subsequent land grant of pre-emption to odd sections on the line of a railroad. The sole question was as to the legal effect of the reservation of this property out of the sales. Reserving the particular lands out of a sale was

for the purpose of an Indian reservation and the question was whether or not this operated as a grant. The court said: ''The reservation of lands for any specific purpose by the government, out of sales directed to be made, if expressed in the most accurate, concise and precise form of words, is but an expression of the desire of the government to use them for that purpose. It does not part with its title by reserving them, but simply gives notice to all the world that it desires them for a certain purpose; therefore the same precision and accuracy is not required as in the case of a conveyance.'' *U. S.* v. *Payne,* 2 Mc-Creary, 298, 301.

This decision of Judge PARKER's presents a most satisfactory and lucid exposition of the precise point that is now before the court, and in its application to this case affords a complete solution of the whole controversy.

*Charlton A. Alexander,* for appellees.

Dedications by individuals are construed strictly according to the terms of the grant, but a less strict construction is invariably employed when dealing with dedications by a state or the public. *Spires* v. *Los Angeles,* 150 Cal. 64; *Riverside* v. *McLain,* 210 Ill. 308.

All acts connected with the dedication of this square are matters of written record and there remains nothing to be deduced or implied. Hutchinson's Code of Mississippi, p. 98, *et seq.,* sets forth concisely a statutory history of the city of Jackson to that date (1898). Pursuant to the act of February 12, 1821, the commissioners set aside certain sections of land, of which the square in question is a part, for the seat of government naming the prospective town of Jackson. Peter A. Vandorn, one of the commissioners, and a surveyor laid off the first map of Jackson now of record in the state archives which survey brought into being square 12, North Jackson. From time to time many of the lots in Vandorn's survey were sold by the state under acts of the legislature with refer-

ence to the said survey. Thus the title to the square rested until the act of February 16, 1838, entitled "An act to dispose of the unsold lands belonging to the state of Mississippi, donated by the United States to this state, for the location of the seat of government." Hutchinson's Code, p. 110.

This was the act of dedication, and it will be noted from the caption above that it was the purpose of the state to dispose of all of the land belonging to the state embraced in Vandorn's map. The prime purpose of the act was the raising of revenue by a public sale of all the lands. This is clear; and for this purpose, and in order that the patents from the state might be accurately described, it directed that the commissioners make a survey and plat of all the land of the state, but excepted from such plat and from such sale and from the terms of the remaining provisions of the act "such blank squares as the said commissioners, together with the governor and the commissioners of public buildings shall select as necessary to be reserved as commons for the health, ornament and convenience of the city of Jackson." This map was directed to be hung in a gilt frame and placed in the office of the secretary of state. This map was prepared in 1838 by Gideon Fitz under the direction of the commissioners appointed by the act of 1838. The map of the city of Jackson published by James Smith in 1845 (which is an exhibit in this record and the original of which will be furnished this court), is a copy of the Gideon Fitz map with additional territory added thereto, no doubt. Whether or not the notations on the margin of the map all appear on the original Fitz map can never be known. Lots were sold pursuant to the act of 1838, and the map made pursuant thereto, and the state by the dedication thereby became divested of all of the fee in all the land included in the original Vandorn survey. The lot in question on the map is marked "No. 12 no., public square." Under the heading: "A list of subdivisions

and squares and owners thereof on April 1, 1845,'' Square
No. 12 is denominated ''public promenade.'' Under the
heading, ''Explanations taken from the original map in
the secretary of state's office (Fitz map) and under the
subheading ''Addition notes,'' appears the following (the
parentheses indicate torn and illegible portions):

''The following lots have been appropriated and re-
served by law 'for the health, ornament and convenience
of the city,' to wit:

''The grave yard lot and te nacre lot No. 6 north, ad-
joining th (　　) et apart for the like purpose when
required. 5 acre Lot No. 6 north for a hospital and
grounds. Square No. 12 north (　　　) menade park,
Square No. 9 south for a market, parade ground, (　　)
nic hall, etc., etc., 7 acre lot No. 7 south and lot (　　　)
the convenience of the City Ferry, College Green and Col-
lege (　　　) uares No. 1 and 2. Court Green and
Court squa (　　) 2, also lots 16, 17, 27, 28, 29, 30, 34,
35 and 36 for (　　　) tional grounds to Capitol Green.
Lot No. 46 (　　) City Corporation by purchase.''

We have thus quoted these explanations in full for
a purpose which we will set out later.

It clearly appears that he legislature in making this
dedication by the passage of the act of 1838 had taken
final action. There was no report required to be made
back to the legislature by the comissioners for ratification
nor was such a report in a particular form for action at-
tempted to be made. Nor was any bill ever introduced or
acted upon rectifying the said map and its explanations
before quoted or marginal notes. When the act of 1838
had been approved by the governor the final chapter had
been written and the final transfer in the title to the va-
cant square deemed necessary by the commissioners for
the ''health ornament and convenience of the city of Jack-
son'' had been written so far as the restrictions in the
dedication and subsequent interference by the state was
concerned.

No legislative body can delegate to any other authority either generally or specifically to enact laws. Cooley's Principles of Cons. Law, p. 111.

The legislature must enact a complete and valid law. *Lammert* v. *Libwell,* 62 Mo. 188, 21 Am. Rep. 411; Oneal v. Am. F. Ins. Co., 166 Pa. St. 72.

The legislature possesses sovereign legislative power over all subjects except such as are expressly or by clear implication prohibited to it by the state Constitution. *Boyd* v. *Ellis,* 11 Iowa, 97; *McMillan* v. *County Judge,* 6 Iowa, 391; *Purczell* v. *Smith,* 21 Iowa, 540.

When the state through its legislature had acted finally the terms of the dedication were complete. *Texas* v. *Travis Co.,* 85 Texas, 435.

The statute was a complete dedication in itself, and no power including the commissioners and the legislature itself thereafter could change its terms. *New Orleans* v. *United States,* 10 Peters, 716; *Commonwealth* v. *Beaver Borough,* 171 Pa. St. 542. See especially page 558, *ib.*; *Lamon Co.* v. *Clemens,* 49 Texas, 347.

Under the unlimited authority granted by the act of 1838 to the commissioners, who can say to what extremes the commissioners and the draftsman might have gone? What would have prevented the commissioners, if the converse of our contentions were true, from designating the city hall square as a graveyard square and the graveyard square as the city hall square; the square in question as a baseball park for the health and convenience of the city; the seven-acre lot, No. 7 south (which was designated as a ferry and which is at this time covered with water), as a place for a public promenade; the five-acre lot, No. 6 north, where Mr. E. E. Frantz and Mr. Edward Yerger now live on North street, from being unequivocally and forever dedicated as a place for a public slaughterhouse, crematory or public toilets? Had they done so, under a construction adverse to our line of reasoning, the city would have been forever bound. The

legislature had this right in the first instance, but when the dedication was once complete the owner could not thereafter revoke it or restrict or change the uses for which it was made. *M. E. Church* v. *Mayor,* 97 Am. Dec. 698; *City of Eureka* v. *Armstrong,* 83 Cal. 623; *Shields* v. *Ross,* 158 Ill. 214; *Davids Heirs* v. *City of N. O.,* 16 La. Ann. 404; *Lamar Co.* v. *Clements, supra.*

Under this hypothetical state of affairs the convenience of the commons to the city of Jackson would be a name only.

The owner only of land can make a dedication and it must be looked to as containing all of the terms thereof; a map made subsequent thereto in variance therewith is of no efficacy or effect so far as it alters or varies the terms of the dedication. The court in the case of the *City of Eureka* v. *Armstrong,* 82 Cal. 623, said: ''The mere fact that the official map, adopted after the dedication of a street has a line drawn across the mouth of the extention to such street. does not deprive the public of the right thereto.''

There is no question, from an examination of the Fitz map as brought down in the Smith map, that the commissioners selected the said ''commons'' according to the terms of the dedication. Had the map followed the terms thereof, all of the bank squares so set aside should have had the word ''commons'' written on each, or the words ''commons for the health, ornament and convenience of the city of Jackson.''

Referring now and at once to the grounds of demurrer Nos. 6, 7 and 8, we come to the question as to whether or not a library, fifty by seventy-five feet, in the center of a square measuring three hundred and twenty feet by three hundred and twenty feet would be a diversion of the ''commons'' or square from the purposes of a ''commons'' for the ''health, ornament and convenience of the city.''

First of all, it becomes necessary to define the word ''commons.'' Black's Law Dictionary gives the follow-

ing definition: "A commons is an unenclosed piece of land set apart for public or municipal purposes in many cities and villages of the United States." In the case of *Goode* v. *City of St. Louis* 113 Mo. 257, the whole case turned upon the meaning of the word "commons." A long strip of land bordering the river had been dedicated by individuals as a commons. The court said: "They use the word common not in any technical sense, but in its popular signification as a parcel of ground set apart for a commons and public use for the convenience and accommodation of the inhabitants of the city. The city may control and regulate the use but it has no right to sell the property and devote it to private use." A similar definition is given in the case of *Cummins* v. *St. Louis,* 90 Mo. 259, which deals with the same land, and goes on further to state: "A part is now used as a park, a use quite consistent with the terms of the dedication." An examination of the two last cited cases shows that quite a variety of public uses had been made of the commons in the discretion of the city: A railroad had been allowed right of way; a market house had been erected; wharfage buildings, and a part kept open for a park, but the word "park" being a more restricted use than "commons," the latter naturally includes the former. But the converse is not at all true.

There is a distinction in the case of *Goode* v. *City of St. Louis, supra,* in which the court said:

"In legal contemplation a 'commons' is not synonymous with 'park.' The legal definition of a common is an unenclosed piece of land set apart for public and municipal purposes in many cities and villages of the United States." The Supreme Court of the United States in speaking of the word, says: "We are not to understand the word in its strictly legal sense as being the right of profit which one man may have in the lands of another, but in its popular sense only as a piece of ground left open for common or public use for the con-

venience and accomodation of the inhabitants of the town.'' In the Lexicographer we find ''park'' quoted as ''a piece of ground enclosed for public recreation or amusement; a piece of ground within a city or town enclosed and kept for amusement and recreation.''   The use of the term ''common'' in a plat of certain land in which a strip was designated to be and remain a ''commons'' forever, does not exclude the use of such plat for railroad trains in lieu and instead of the slow-moving wagons of other days which is but a change in the method of the public use and not in the use itself, and such method is entirely germane to the purposes of the original dedication and control of the municipal authorities.''

The court in the case of *White* v. *Smith,* 97 Mich. 291, says: ''There was a piece of ground marked on the plat 'commons,' which indicated an intention on the part of the owner to dedicate it to the public for any use which the proper authorities might deem proper and which could be legitimately regarded as public; and though at the time the plat was made the proprietor did not fully understand the meaning of the word 'common' as there used, this can make no difference.''

As land cannot be dedicated for anything but public use, the word ''common'' as defined by all of the courts, and after carefully comparing decisions on all appellations referring to land, is the broadest and most comprehensive term that could have been used.  Its meaning, in connection with the present case, is that all of the public alike are to have free ingress over, in and through the same, and that no use is to be made of the land which would debar anyone in such use.  In view of this universal acceptation of the term ''commons,'' does it not strike the court as singular that the commissioners appointed to plat the lots for sale should have taken upon themselves to decide what purposes came within the term, ''commons?''  An examination of the explanations to the map with reference to other squares shows there is

no doubt but what a hospital at some time after the dedication would have been of advantage on five-acre lot No. 6 where Mr. Yerger's house now stands, and the absence of the hospital there at this time is conspicuous. Square No. 9 south, where the city hall now stands, was dedicated by the draftsman in the following language:

"Square No. 9 south for a market, parade ground, masonic hall, etc., etc." We fail to see how a parade ground comes within the term of health, ornament and convenience of the citizens at large. We fail to see how a Masonic Hall is a proper use for a "commons," open alike to men, women and children. We fail to understand just where the limit would rest in the words" etc., etc." What has become of College Green and College Squares Nos. 1 and 2, and Court Square and Court Green? We merely cite these instances to show the fallacy of dragging this map into court and limiting the use of the commons by reason of its marginal notes and other notations. In fact, with reference to Square No. 12 there are three distinct purposes, each having a different legal meaning: "public square," "public promenade" and "promenade park."

The exhaustive note found in 25 L. R. A. 980, *et seq.,* we think clearly sets out the distinction between the uses to which a "commons" may be put.

There is not in the books a case which uses in connection with the word "commons" the terms "health, ornament and convenience," but it takes no judicial authority to determine that a beautiful and well-equipped library costing twenty-five thousand dollars, in the center of this square, and especially a munificent gift to the city, would come fairly and squarely within any one or all of the said terms, especially if liberally construed, as it should be. More especially are we unable to understand how anyone could contend that it would not be a convenience and a place for recreation and diversion, and therefore,

of health. See *Newport* v. *Taylor Heirs,* 16 B. Mon.
(Ky.) 699.

In the case of *Church* v. *City of Portland,* —— L. R. A.
259, cited in the brief of able counsel for appellant we
submit is not at all in point nor can the *dictum* be im-
plied in any sense to fit this case, as the same was de-
cided on a dedication to the city "as a public square for
the use of the inhabitants thereof, and the public gen-
erally, as an open plaza, and it was to be kept and main-
tained as open ground, to be planted in trees and other-
wise ornamented as a place for public gatherings and out-
door recreation." While it is true that the only words
used were "public square," it was accepted in the terms
above set out and the acceptance of the dedication is as
important as the grant. It was held in that case that the
general dedication of land for public squares implied that
they were to be enjoyed by the public at large, and could
not rightly be appropriated by the city authorities for the
use of the city in the management and conduct of its
economic affairs. Otherwise this case is not in point.

*Thomas Moore,* for appellee.

After a careful examination of the petition for in-
junction it is clear that the erection of a public library
in "Smith Park" will not cause the appellants irrepar-
able damage, or any injury whatever, and we contend that
land dedicated may be devoted to such uses as are con-
sistent with, or necessary to, the principal use.

An injury is irreparable when it is of such a nature
that the injured party cannot be adequately compensated
therefor in damages, or when the damages which result
therefrom cannot be measured by any certain pecuniary
standard.

In view of the above I will now quote the conclusion of
section 1 of the original bill found on page 3 of the rec-
ord: "That if the city be allowed to erect a building or
library on said lot it will decrease the value of complain-
ant's property and cause irreparable damage to com-
plainant."

Value of all property in Mississippi is fixed by a pe-
cuniary standard; our tax rolls and all assessments will
bear me out in this statement.

We say that the erection of the library sought to be
enjoined cannot be shown and is not shown on the face of
the bill to be irreparable, and unless coupled with the al-
legations of the insolvency of the defendants, renders the
complaint fatally defective.

"A general allegation that the acts apprehended will be
irreparable unattended by such a statement of facts as
enables the court to see that such will be the result, is in-
sufficient. The pleader must not content himself with a
mere averment of his conclusions, but must show how
the irreparable injury apprehended is to arise, giving a
full and detailed statement of the facts and circum-
stances, the nature and conditions of his property, etc.,
so as to enable the court to determine the necessity for an
injunction." See 10 Ency. Pleading & Practice, p. 954.

Because the appellant bought a lot opposite this square
and erected a dwelling house thereon is no reason why
her alleged damage would be special or particular to her
alone, or even those dwelling or having property rights
around said square, nor besause of the fact of proximity
to this property is she, or they, entitled to damages more
than any other citizen of this city would be.

Now turning to section 4 on page 4 of this record, we
find the following: "Your complainant would show that
Square 12, North Jackson, was selected by said commit-
tee as such commons for the health, ornament and conven-
ience of the city of Jackson, and a plat of same made
shortly afterwards. Wherefore your complainant
charges that the city of Jackson is the rightful owner of
said Square 12, North Jackson, and that the same must
be used for the purposes mentioned in said grant as
commons for the health, ornament and convenience of
the city of Jackson."

It is well known that a petition for an injunction to
restrain misuse, waste, etc., showing on its face that title

is in the defendant, simply states himself out of court (both at law and in equity).

The plaintiff is never entitled to an injunction unless it is apparent from the bill that he has some interest that may be injuriously affected by the act which he seeks to restrain; and, consequently, it is a general rule which is applicable to all bills for injunction, that the plaintiff must allege that he has such an interest or title, by contract, prescription, or otherwise, as the court will feel bound to protect upon the showing of the bill against the apprehended acts of the defendant. As has been remarked by the learned judge, it is axiomatic that a party to any form of litigation whether at law or in equity, must show a valid right. The plaintiff will not be assumed to have any other or better title than that which is asserted in the bill." See 10 Ency. Pleading & Practice, p. 944.

Under the act dedicating this lot and others the commissioners were allowed much latitude in their selection of lands to be reserved for the health, ornament and convenience of the city of Jackson; in fact it was just a matter of preference of the commissioners as to what and how much was to be reserved to the city, and they had the power to place any words in Square 12, North Jackson, which they might choose without further legislative enactment (I respectfully refer the court to said act, Hutchinson's Code p. 110); and the words "Public Square" placed on said map clearly indicates that said property is to be used by the city for public purposes, and a public library in a public square for the use of the community in general is certainly not inconsistent or foreign to the terms of the dedication or the action of the commissioners, but would enable the citizens to more thoroughly enjoy the use of said lands.

The case of *Rowzee* v. *Pierce,* 75 Miss. 846, was where lands had been dedicated by individuals for a specific purpose and distinctly set out the object of the donation, viz., "only for the public use as an ornamental park."

and the dedicators being individuals, and not the state, the most rigid construction was adopted.

The only cases that seem to be absolutely parallel to the case at bar are *Spires* v. *Los Angeles,* 150 Cal. 64; *Attorney-General* v. *Sunderland,* 45 L. J. Ch. (N. S.) 839; *Britton* v. *Park Commissioners* et al., 76 Cal. 156; I call the attention of the court especially to the case first above mentioned.

*Powell & Thompson,* for appellee.

The only question in this case is as to whether or not the building of a public library in Smith Park is inconsistent with the terms of the grant by the state to the city of Jackson, to wit, "for the health, ornament and convenience of the city of Jackson."

The court will find in a footnote to the case of *Codman* et al. v. *Crocker* et al., 25 L. R. A. (N. S.) 982, practically all of the authorities both *pro* and *con* upon this subject.

A different construction is placed upon the donations made by individuals from those made by the public; the former are construed strictly, according to the terms of the grant, while in the latter case a less strict construction is adopted. *Spiles* v. *Los Angeles,* 150 Cal. 64; *Riverside* v. *McLain,* 210 Ill. 308. There are two lines of authority upon the subject in hand; one holding that the building of a public library and museum in a park dedicated for public use is not inconsistent with the grant. In *Attorney-General* v. *Sunderland,* 45 L. J. Ch. (N. S.) 839, the court says, "Land composing part of a park to be used 'as public walks or pleasure grounds' cannot be used for the cite of a town hall but the erection of a museum and library is allowable."

In the case of *Spiles* v. *Los Angeles,* 150 Cal. 64, terms of the dedication to the city of Los Angeles were "as a public place forever for the enjoyment of the community in general." And the court says that the establishment of a public library to which visitors to the park have ac-

cess is consistent with such public enjoyment and tends
to enlarge it.

Along the same lines is *Riggs* v. *Board of Education,*
28 Mich. 262.

There is another line of authorities holding that the
building of such structures as courthouses, schoolhouses,
jails, etc., in a public park are inconsistent with the terms
of the dedication of a park for public use.

Among these decisions and the leading case upon the
subject is one of our own to wit, *Rowzee* v. *Pierce, 75*
Miss. 846, wherein it was held that where a park was
dedicated for public use as an ornamental park exclu-
sively "the building of a schoolhouse thereon was sub-
versive of the objects of the donation.

These two apparently conflicting lines of decisions are
really not conflicting when properly considered, because
in the case of the erection of public libraries and
museums no part of the park is taken from the public
enjoyment but are open and accessable to all the people
and such a building simply diversifies the objects for
which the parks were intended, to wit, the amusement and
enjoyment, health and convenience of the entire public,
and we undertake to say that our esteemed opponents
cannot find a single case in the United States or England
where the building of a public library or museum has
ever been construed to be inconsistent with the terms of
a grant donating to the public use. On the contrary, as is
judicially known to the court, nearly or quite all of the
parks in the great cities of the United States have one or
both of this kind of buildings.

The other line of authorities holding that the construc-
tion of courthouses, schoolhouses, jails, or building for
mechanical purposes, in a public park is inconsistent with
the terms of the grant for the public use, undoubtedly
proceeds upon the idea that the erection of this class of
buildings takes away from some part of the public the use
of the park. As for instance a schoolhouse would only

be occupied by the school children and the teachers; a jail by the prisoners; a courthouse in a large part by public officers, and thus this character of buildings not being used or enjoyed along the line for which public parks are intended, their erection would be inconsistent with the grant of the land for the general public use.

Of course, the terms in which the dedication is made would naturally have a controlling effect. In this case we cannot conceive how the legislature could have employed broader terms than was done in the grant in question.

For these reasons we think the decisions of the court should be affirmed.

Argued orally by *Frank Johnston,* assistant-attorney-general, for appellant and *Charlton Alexander,* for appellee.

COOK, J., delivered the opinion of the court.

Mrs. Jones, a citizen of Jackson, filed a bill in the chancery court of Hinds county, first district, seeking an injunction against the mayor and board of aldermen of the city of Jackson to restrain the board from erecting a library building on Smith Park, in the city of Jackson. The state of Mississippi intervened in this case, and was made a party complainant by an order of the chancellor, and filed its bill in the case, setting up its claim and title of the state to this open square or park. It is the contention of the state that the state is the owner in fee of Smith Park, and that it has never parted with its title, and dominion and control over the same. It is submitted by the state that, if it is mistaken in this, the erection of a library on this lot is a perversion of the purposes for which it was dedicated by law.

By an act of the Legislature of date February 12, 1821, commissioners were appointed to locate two sections of land in a country lately ceded to the United States by the Choctaw Indians as soon as the same may be surveyed,

for the purpose of a seat of government for this state. On
November 28, 1821, an act amendatory to the act of Feb-
ruary 12, 1821, was passed by the legislature, which pro-
vided that certain commissioners therein mentioned
were authorized and empowered to locate a permanent
seat of government in the east halves of sections 3 and
10 and the west halves of sections 2 and 11, in township
5, range 1 east. By this act the commissioners were au-
thorized and empowered to lay off a town on such part
of the location so made, and on such plan, as to the com-
missioners might seem most advisable, providing, further,
that the town so laid out should be called by the name of
Jackson, in honor of Maj. Gen. Andrew Jackson. On
June 30, 1822, the legislature passed an act approving the
previous acts upon this subject and establishing the town
of Jackson. In section 2 of said act the commissioners
were directed to cause a copy of the plan of said town to
be recorded in the office of the clerk of the county court,
or in that of the register of the probate court, of Hinds
county, and another copy to be certified, signed, and de-
posited in the office of the secretary of state. Various
acts were thereafter passed, providing for the sale of lots
in the town of Jackson, and for the erection of the Cap-
itol and executive mansion, and establishing a state peni-
tentiary.

Afterwards, on February 16, 1838, by an act of the
Legislature entitled "An act to dispose of the unsold
land donated for the seat of government" (Laws 1838, p.
269), the secretary of state, auditor of public accounts,
and treasurer of the state were appointed commissioners
to cause to be made a survey and plat of all unsold lots
belonging to the state of Mississippi embraced in the do-
nation made by the general government to this state for
a seat of government, including the blank squares, and to
sell the same, "except such blank squares as the said
commissioners, together with the governor and the com-
missioner of public buildings shall select, as necessary to

be reserved as commons, for the health, ornament, and convenience of the city of Jackson.'' It is also provided in this act that a plat shall be made by said commissioners and entered of record in the clerk's office of the police courts of the counties of Hinds and Rankin.

It will be observed that the legislature of the state was laying out a town, and making maps thereof, and disposing of said lots to private owners, and generally providing for the sale of all of the state's property within the limits of the city of Jackson, except that part which had been reserved for state purposes and the blank squares dedicated to the use of the public. We are called upon to construe section 1 of the Act of February 16, 1838, or rather that particular clause reading: ''Except such blank squares as the said commissioners, together with the governor and commissioner of public buildings, shall select, as necessary to be reserved as commons, for the health, ornament, and convenience of the city of Jackson.''

The learned assistant attorney-general earnestly and forcibly insists that the only purpose of the act of February 16, 1838, was to provide for the sale of lots, and to reserve certain blank squares from the sale, including the square known as ''Smith Park,'' the subject of this controversy; that the language above quoted cannot be construed as a grant or donation to the city of Jackson, but was intended merely as a reservation of blank squares to be selected by the commissioners from the general sale of city lots belonging to the state, and that the squares so reserved remain the property of the state, to be disposed of as the legislature may elect. The city of Jackson, on the other hand, contends it was the intention of the legislature to donate the excepted squares to the city.

We think the state is correct in its position that there was no grant or donation, but incorrect in so far as it contends that the state has now the complete dominion and control of the square called Smith Park. We can

perceive no difference in the state's action in the premises from that of a private owner of land, who surveys land for sale, providing for streets, alleys, and parks, or commons, and selling lots with reference to the plat of the survey. We do not believe it would be seriously contended that the legislature could close all the streets and alleys of the city of Jackson which were laid out in the original plat of the city, and we think it equally as clear that it cannot be maintained that the state now has the right or power to take charge of the square in question and close it to the public. When the state ordered a survey of all blank squares into lots, except such as might be selected "as necessary to be reserved as commons, for the health, ornament, and convenience of the city of Jackson," and decided that a map should be made showing the reserved "commons," this was a dedication of the reserved squares to the use of the public, and is irrevocable, so far as the dedicator is concerned. As a matter of fact, the square known as "Smith Park" was selected by the commissioners and is shown on the map as a "Promenade," and since its dedication the state has made no claim to domain over or control of the same.

It may be, and probably is, true that the state is the owner of the fee, and if the city should abandon its use as a commons, or close the square to the public, the same would revert to the owner of the fee—the state. There has never been a grant to the city; merely a dedication of the square for a commons was made, and it must remain a commons forever and be kept open to the public as such, and if the city is now attempting to use it for some other and different purpose, the dedicator has the right to invoke the aid of the courts to restrain the city from executing this unlawful purpose.

We come now to a discussion of the alleged attempt of the city to divert the square to a use which was not contemplated by its dedication. Would the erection of a public library upon this square be inconsistent with

its use as a commons for "the health, ornament, and convenience" of the public?

The state directed the commissioners designated to sell its lots to select certain squares, and when so selected the squares were to be reserved "as commons for the health, ornament, and convenience of the city of Jackson." A common is a piece of ground *left open* for common or public use, for the convenience and accommodation of the inhabitants of the town." Am. & Eng. Ency. of Law, vol. 6, page 232.

There is some conflict in the authorities as to when the erection of a building on land dedicated to specific uses will be regarded as a violation of the terms of the dedication. Taking into consideration the time when the state dedicated this square, and the uses to which it was dedicated, we think it was the intention that the square was to be *kept open* for the use of all the people, and that this was the construction placed upon the act by the commissioners appointed to carry out the purpose of the dedicator is manifested by the designation of the square as a "Promenade." "Whether or not a particular use of land dedicated for squares, parks, and commons amounts to a diversion from the uses for which it was dedicated depends upon the circumstances of the dedication and the intention of the parties making it, and is therefore largely a question of fact." The authorities with reference to this principle are collated in the note to *Codman* v. *Crocker,* 25 L. R. A. (N. S.) 980.

In some of the cases it is held that it would not be a violation of the deed of dedication to erect a museum and library upon lands dedicated to park purposes; in others it is held that schoolhouses, courthouses, and other public buildings cannot be erected upon lands dedicated to uses as a public park. In fact, there is a great diversity of opinion upon this identical question, and the courts seem to have decided according to the varying views of the judges composing the courts rendering the decisions. The

test, at last, is the intention of the dedicator of the property, to be determined by all of the surrounding circumstances and the terms of the dedication. A contemporary construction of the act of the legislature certainly has some significance, and we think affords a safe guide for the interpretation of the legislative will. If a public library may be erected upon one corner of this lot, and a public museum upon another corner of the lot, according to the holding of some of the courts, it is manifest that its characteristics as a commons would be destroyed.

It is hardly probable that the dedicator had the prevision to anticipate the advent of a Carnegie Library. The dedication was made seventy-five years ago, and while the legislature evidently dreamed of and hoped for the day when Jackson would become a city in fact as well as in name, it cannot be said that they looked to the erection of libraries and museums upon this small plat of ground labeled "Promenade" upon the map. In endeavoring to construe the dedication according to the intention of the dedicator, it is believed that the chief officers of the state appointed to select and plat the state's property were in touch with the legislative mind, and when they designated the square in question as a "Promenade"—a walking place for the public—this designation affords a means whereby we can now interpret the language employed by the act.

In *Rowzee* v. *Pierce,* 75 Miss. 846, 23 South. 307, 40 L. R. A. 402, 65 Am. St. Rep. 625, this court held that a schoolhouse could not be erected upon land dedicated to an ornamental park, and it seems clear to us that this court then construed the deed of dedication strictly according to its terms, and the reasoning of the court in that case supports the view we take of this case. It is difficult to distinguish a schoolhouse from a library—the one is for the use of school children, the other for the use of a limited number, whatever may be the theory to the contrary.

We conclude that the chancellor erred in refusing the injunction in this case, and the judgment is therefore reversed, and a judgment here will be entered granting the injunction prayed for.

*Reversed.*