WESTBROOK *et al. v.* CITY OF JACKSON.

(Division A. Dec. 12, 1932. Suggestion of Error Overruled Jan. 23, 1933.)

[145 So. 86. No. 29650.]

Wells, Jones, Wells & Lipscomb, of Jackson, for appellants.

W. E. Morse and Green, Green & Jackson, of Jackson, for appellee.

664

**W. E. Morse** and **Franklin, Easterling & Rosenthal,** of Jackson, for appellee.

666

Argued orally by **Barrett Jones**, for appellant, and **Garner Green** and **Lamar Easterling**, for appellee.

**McGowen, J.,** delivered the opinion of the court.

W. W., W. V., and Rondo Westbrook exhibited their bill in the chancery court of Hinds county against the city of Jackson, and John L. Ware, praying for a cancellation of an oil lease from the city of Jackson to Ware, and that the complainants be declared the sole owners of the property, and the city of Jackson be declared to have no right, title, or interest in or to the lands described, and that the city of Jackson's claim be canceled as a cloud upon their title.

The land involved is described as lots 35 and 36, according to Daniel's official map of the city of Jackson,

and as containing six and twenty-one hundredths acres and twelve and thirty-one hundredth acres, respectively excepting a certain portion thereof conveyed by the city of Jackson to the Westbrooks heretofore.

During the progress of the trial it developed that lot 36 appeared to be lot 30 according to Daniel's map of the city of Jackson, and the Westbrooks were permitted to amend their bill of complaint as to this description, whereupon the city of Jackson filed its answer, demurrer, and cross-bill and prayed that its title be confirmed and that the patent from the state, through which the Westbrooks claimed the land, be canceled as a cloud upon its title, for the reason that the state of Mississippi had dedicated the land in question to public use. The answer of the city of Jackson set up title by dedication, by adverse possession, and by presumption of lost grant; the invalidity of the patent from the state on which the Westbrooks title rested; estoppel, and by a plea of non est factum.

In the answer to the city's cross-bill there was interposed a demurrer and motion to strike certain portions of the cross-bill which were sustained by the court to the extent that the plea of non est factum and adverse possession of the city against the state be held not to be an available defense to the city as a matter of law.

The Westbrooks' answer to the cross-bill challenged the allegations of the city as to dedication and as to presumption of a lost grant.

Appellants offered in evidence a patent from the United States to the state of Mississippi to sections of land in which these lots are situated, under the provisions of the act of Congress approved February 20, 1819, and signed by Woodrow Wilson, President, and L. Q. C. Lamar, Recorder of the General Land Office, dated September 21, 1915. The Westbrooks then offered a patent from the state of Mississippi to the Westbrook Manufacturing Company, dated July 1, 1930, and recorded in the

chancery clerk's office in Hinds county, Mississippi; and during the trial offered an amended patent correcting the description as to the number of the lot indicated heretofore, together with some oral evidence as to the location of the lots, the conditions under which the patents were issued, and leases executed by the city to I. C. Enochs, the first in date being May 26, 1888, leasing lots 35 and 36, but declining to covenant quiet possession thereof.

Daniel's map of the city of Jackson was offered showing that lots 35 and 36 were east of and abutting Jefferson street, lot 36 being south of, and lot 35 being immediately north of South street.

The evidence is undisputed that these lots have a small portion of high land on the west side, with the greater portion of the east side being very low and marshy, for the most part under water, with a lake or lakes thereon. Lot 7 S is immediately south of lot 36, and is shown on all the maps as being adjacent to and abutting on Pearl river, and for a long time prior to and subsequent to the Civil War used as a ferry landing for the ferry across Pearl river.

Since the execution of the first lease by the city of Jackson to I. C. Enochs, the city has been in possession of these lots by itself or through its tenants. In 1907 the city erected a crematory on lot 36, and in 1929 the city built a new crematory at a cost of fifty-four thousand dollars on said lot. The small portion of land above high water on the west side of these lots was used as a nucleus from which city garbage could be dumped from the high land over the sharp declivity, for many years prior to the occupation of said land by I. C. Enochs, and thereby the city, with its garbage, had gradually built up the lowlands.

One witness testified that boats, prior to the Civil War, were accustomed to land at these lots.

Hon. Marcellus Green testified, in effect, that these

lots, in conjunction with lot 7, were used as a woodyard by Green and Tapley in 1868, in which use he participated.

Many witnesses testified that the common understanding was that the city of Jackson owned the lots in controversy prior to and since the Civil War.

In 1903, the city bored an artesian well on the front lot 36, which proved to contain mineral water unfit for human consumption, and a bath house was erected for people who desired to bathe therein for skin diseases.

Daniel's map, which was approved by the committee appointed by the Legislature, and by the city authorities, does not show the reservation of lots 35 and 36. The Westbrooks concede that lot 7 belongs to the city of Jackson.

The evidence further shows that the major portion of the city of Jackson, when first established, was on South State street, south of the old capitol, and that the principal artery of commerce was Pearl river.

Without detailing the evidence of the witnesses examined in reference to the character of the possession by the city of Jackson of these lots, we will say that the chancellor was warranted in believing that the witnesses referred to lots 35 and 36 in conjunction with lot 7 as a general landing place for commercial purposes in that day, prior to the Civil War. The evidence further discloses that during the Civil War the city records were destroyed; and that the state of Mississippi, in 1821, took possession of these lots which are a small part of the two sections of land granted in 1819 by an Act of Congress, and that, so far as any record shows, no patent was ever issued by the United States to the state of Mississippi until 1915.

We think it well to set forth the Act of Congress granting lands for a seat of government to the state of Mississippi, as follows: "Sec. 1. Be it enacted by the Senate and House of Representatives of the United

States of America, in congress assembled, That there shall be granted to the state of Mississippi, two entire sections of land, or fractional sections, or quarter sections, not exceeding the quantity contained in two entire sections, for a seat of government in said state; which land shall be located in one entire tract, at such place as, under the authority of the said state, shall be designated for the seat of government therein, whenever the Indian title shall have been extinguished thereto, and before the commencement of the public sales of the adjoining and surrounding lands belonging to the United States.''

Section 2 has to do with the grant of land for the support of Jefferson College, etc., Poindexter Code, 1823, p. 536 (Act Cong. Feb. 20, 1819, 3 Stat. 485).

It historically appears that representatives of the Choctaw Indians and the United States government met at Doak's Stand in the southeast corner of Madison county, a few miles from the city of Jackson, and, on October 18, 1820, General Jackson and the Indians executed a treaty by which the lands in controversy were ceded to the United States government, and subsequently in 1830, the Choctaw Indians conveyed the remainder of lands claimed by them to the United States government by a treaty known as the Dancing Rabbit Creek. Subsequent to the Act of Congress, supra, on February 12, 1821, Hutchinson's Code, p. 98, c. 4, art. 1, the Legislature of Mississippi passed an act appointing Commissioners Hinds, Patton, and Lattimore to locate two sections of land in the country lately ceded to the United States by the Choctaw Indians, and in November of the same year, Hinds, Lattimore, and Van D'orn were authorized and empowered to locate the east half of sections 3 and 10, and the west halves of sections 2 and 11, in township 5, range 1, etc., as a permanent seat of government for this state; and the commissioners were authorized and empowered to lay off a town to be known by the name of ''Jackson.'' On June 30, 1822 (Hutch-

inson's Code, p. 99, c. 4, art. 3), the plans of the city of Jackson as laid out by the commissioners were approved. It was directed by the Legislature that these plans be recorded. They are not now in existence.

By an act passed January 21, 1823 (Hutchinson's Code, p. 100, c. 4, art. 4), the Legislature declared that the two sections of land were subject to any disposition of the General Assembly, and there appears this language therein: "That the lands, designated in the plan of said town, and attached to capitol-green, college-green, and court-green, and not less than two acres, nor more than five, on each side of Pearl River, within the limits of said location, for the seat of government, . . . shall be reserved exclusively, in perpetuity, for the use and benefit . . . of said town."

On February 16, 1838, the Mississippi Legislature passed an act directing a sale of the unsold lands donated for a seat of government (Hutchinson's Code, pp. 110, 111, c. 4, art. 18, sec. 1), in which it was provided that: "The Secretary of State, the Auditor of Public Accounts, and the Treasurer of the State, are hereby appointed Commissioners, under the direction of a majority of whom a survey and plat of all the unsold lands belonging to the State of Mississippi, embraced in the donation made by the general government to this state, for a seat of government, including the blank squares, except such blank squares as the said commissioners together with the Governor, and the Commissioner of public buildings shall select, as necessary to be reserved as commons, for the health, ornament, and convenience of the City of Jackson, shall be made, and when so made, shall be entered of record in the clerk's office of the police courts of the counties of Hinds and Rankin."

Chapter 24 of the Acts of 1844 appointed certain state officials to sell, after advertising, on the 1st Monday of June, 1844, the lots belonging to the state, and there is offered in evidence a photostat copy of the advertisement

of lots 35 and 36, with many others, and a report of the sale of the lots so advertised, with lots 35 and 36 being reported as unsold. At this sale, the city bought lot 46.

By section 1 of the Mississippi Act of 1844, the Legislature reserved from sale the capitol grounds, the penitentiary grounds, and other lots.

On March 5, 1846 (Laws 1846, c. 28), the Legislature again passed an act ordering a sale of lots with reservation of lots "permanently preserved from sale."

The evidence shows that in 1838, Acts 1846, chap. 28, one Gideon Fitz made a map of the city of Jackson, which map is not now in existence nor has it been seen by some of the oldest lawyers now living interested in land titles. In 1845, one James Smith made a map of the city of Jackson which purported to show the facts and delineations set forth on the ancient Fitz map. The Smith map is shown to be in existence in the city engineer's office, and several witnesses testified in effect that it is an authentic map of the city of Jackson, though never adopted officially by either the state or the city.

There is set forth in the brief of Mr. Charlton Alexander, in the case of Jones v. Board of Aldermen of City of Jackson, 104 Miss. 460, 61 So. 456, a reservation of lands as shown by the Smith map which appears to have been copied by him (Smith) from the Fitz map made in 1838, which showed that certain lots were reserved by law for the health, convenience, and ornament of the city of Jackson, such as graveyard lot, promenade park, square No. 12, and lots 35 and 36 as additional grounds to capitol green.

It is further shown that the records of the original Fitz survey have entirely disappeared, but there is evidence of such records having been, at one time, in the secretary of state's office.

It will be observed that the Westbrooks, appellants here, made out a record title to the lands in controversy, and that the city's claim to the lots must be based upon

dedication thereof by the state, or on presumption of a lost grant, as alleged in the pleadings, by the sale of 1844 hitherto referred to.

The abstract of title here in evidence in respect to the Tract Book of the Original Entries of government lands in Hinds county, Mississippi, on file in the office of the General Land Commissioner at Washington, D. C., with a copy on file in the chancery clerk's office in Jackson, Mississippi, shows a reservation of land for a seat of government, and points to the sections selected by the commissioners and approved by the Legislature of Mississippi, of which these lots here in controversy are a part.

The court below, in a written opinion, held that there were both a dedication and a presumption of a lost grant on the part of the state to the city of Jackson, although counsel for appellants, in their brief, contend that the opinion is based wholly upon a presumption of a lost grant.

The decree of the court below denied the relief prayed for in the original and amended bills, and dismissed same, and restrained and enjoined the Westbrooks, appellants here, from trespassing upon lots 35 and 36, except that portion which had been conveyed by the city of Jackson to them.

There is much evidence and many contentions urged in this case, to which we deem it unnecessary to refer in view of the conclusion we have reached.

■ Counsel for the appellants first contend that there could be no dedication or any kind of alienation of this property by the state prior to 1915, the date of the patent, because, under the language of the Act of Congress in 1819, a patent was necessary in order to invest the state of Mississippi with title, citing in support of this contention the cases of Willoughby v. Caston, 111 Miss. 688, 72 So. 129, and Dees v. Kingman, 119 Miss. 199, 80 So. 528. The Willoughby Case involved swamp land

under the Act of 1850 whereby swamp lands were granted to various states of the Union. In this case it was held that the statute of limitations did not begin to run until the United States conveyed the title by a proper patent, the grant being in process of administration by the Department of the Interior for the purpose of its determination as to whether or not the particular lands were actually swamp lands, in which case a patent was essential. In the Dees Case, the court merely stated that it was conceded that the title passed to the state from the United States by the Act of Congress of 1850.

The contention of counsel for appellants leads to the inevitable conclusion that the title to that part of the city of Jackson which was granted by the Act of Congress in 1819 has remained in the sovereign, the United States, until the date of the patent issued by the United States. In other words, the appellants' contention is that neither the state' nor its grantees acquired title until the date of this patent.

Our own conclusion is that this is manifestly not a correct interpretation of the Act of Congress quoted above in this opinion. There was a grant in praesenti in 1819, subject only to the acquisition of the claims of title of (by the United States) the Choctaw Indians. We have shown that, prior to the acceptance and location thereof by the Legislature, the United States had acquired, by treaty of October 18, 1820, the lands involved in this controversy. Survey was made and location in pursuance thereof, and adopted by the Legislature in 1821-22. The entries and location of these lands were entered of record in the land office of the United States as being reserved for the seat of government of Mississippi; and the departments of each government have so construed the Act of Congress for nearly a century.

We are of opinion that the Act of Congress was a grant in praesenti completed, as we have indicated, by its acceptance and location by the Legislature of the

state of Mississippi. The right of location and selection from the public lands was granted absolutely to the Legislature of the state of Mississippi; and, when that right was exercised, there was nothing for the Secretary of the Interior to do. The divestiture of the government's title was complete, and the investiture of the title in the state of Mississippi was also complete. And this title relates back to the date of the original grant by the Act of Congress of 1819. It became complete upon identifying the section and the location thereof by the state of Mississippi, without any patent, this court so holding, in Henderson v. Blair, 102 Miss. 640, 59 So. 856, 858, in construing the Act of Congress of 1850, granting swamp and overflowed lands, that a patent was unnecessary as to lands which were actually swamp lands at the date of the passage of the act. In that case, Judge SMITH said: " 'The patent would simply be evidence of such an identification and declaratory of the title conveyed,' " citing authorities sustaining the view announced here. See, also, Cameron v. U. S., 148 U. S. 301, 13 S. Ct. 595, 37 L. Ed. 459, and Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733, 23 L. Ed. 634.

A grant of public lands may be made by law as well as by patent. U. S. v. Rowell, 243 U. S. 464, 37 S. Ct. 425, 61 L. Ed. 848.

We are, therefore, of opinion that the patent issued in 1915 is only an evidence of title which was granted absolutely by Congress in 1819.

■ Counsel next contend that the Smith map is not competent in this case. It is shown to have been made by Smith in 1845, and, so far as can be ascertained, is the only evidence in existence of the early topography and plans of the city of Jackson as delineated by the Fitz map, and it has been recognized by the city and people dealing with lands in the city, having been in the city's custody for many years, as being correct and authentic. It is certainly important as an ancient document, and

it has the respectability of age. The Alexander brief, above referred to, shows the illegible condition, in part, of the legend on the Smith map as it appeared to be when that brief was written. It is more so today. The evidence sufficiently shows a public recognition of the Smith map, and of its genuineness. The decree of this court in Jones v. Board of Aldermen of City of Jackson, supra, was based upon the evidential value of the map.

█ The court below held that the lots in controversy had been dedicated by the state to the city of Jackson.

Appellants must rest upon the contention that there was no dedication in order to plant their right to maintain their bill on the claim that the title rested in the state until 1930 when the land commissioner issued the state's patent to the Westbrook Manufacturing Company.

The Smith map made in 1845 purports to reproduce the marginal notes or legend, said to have been delineated on the Fitz map, showing the reservation of lots from sale for the use of the city of Jackson. The Fitz map is clearly not now in existence and must have been lost long before 1875, when the official Daniel's map came into existence.

Appellants plant their case on the entire accuracy and reliability of the Daniel's map, and contend that the Smith map, made in 1845, is wholly without authenticity.

We think the chancellor was warranted in looking to the Smith map as reliable, competent evidence from which to judge of facts set forth by it. The Daniel's map does not undertake to set forth the reservations referred to by the Legislature in 1838, nor is it in conflict with the Smith map in that particular.

The Act approved February 16, 1838 (Hutchinson's Code, pp. 110, 111), referred to lands to be reserved by the Governor and commissioner of public buildings, "as commons for health, ornament, and convenience of the City of Jackson."

Presumptively and certainly this was done, though at this late date· this marginal entry on the Smith map purporting to be obtained from the Fitz map is the only written evidence extant showing the reservations or dedications then so authorized.

The acts of 1844 and 1846 show clearly that the Legislature knew of, and ratified, these reservations or dedications that had been delineated on the plat ordered to be made by it in 1838.

It is idle now to argue that these lots, Nos. 35 and 36, are not adaptable for the health, ornament, and convenience of the city of Jackson. The Legislature and its commissioners were then and there the judges of the adaptability of the lots.

On the margin of the Smith map appear these words: "The following lots have been appropriated and reserved by law for the health, ornament and convenience of the City, to-wit," then follows especially, Promenade Square 12 and lots 35 and 36.

This statement of facts brings the case at bar within the rule announced by this court in the case of Jones v. Board of Aldermen of City of Jackson, 104 Miss. 449, 61 So. 456, as epitomized in the first syllabus thereof, to wit: "Where under Laws 1838, page 269, so providing, certain officers were appointed commissioners to cause to be·made a survey and plat of all unsold. lots belonging to the state, embraced in the donation made by the general government to this state for a seat of government, including the blank squares, and to sell the same 'except such blank squares as the said commissioners, with the governor and commissioners of public buildings shall select, as necessary to be reserved as commons, for the health, ornament, and convenience of the city of Jackson,' and providing that a plat should be made and recorded. And a map was accordingly made showing the reserved commons designated as a promenade. This was not a grant or donation of the fee to the city of

Jackson but was a dedication of the reserved square to the use of the public and is irrevocable, so far as the state is concerned.''

The dedication of lots 35 and 36 to the city is as clear as the dedication of Promenade Park, or Capitol, State, or Jefferson streets.

We might add to what is said in the opinion in the Jones Case, supra, that the Congress of the United States evidently desired to establish an urban community at the seat of government of this state in which the Legislature of Mississippi concurred. The latter endeavored to carry out this idea, and, no doubt, looked upon the lots here in controversy as useful and valuable adjuncts to river transportation, for landing facilities, and other things connected therewith.

Who can say that such a dedication did not tend to enhance the value of the dedicator's remaining lots?

There cannot be drawn any logical distinction between the ''Promenade'' discussed in the Jones Case and lots 35 and 36 involved in the case at bar. The dedication being clear, the city holds by dedication from the state, which, in turn, acquired the title and right to so dedicate to the city of Jackson, and that dedication was fully and completely accomplished by the Act of 1838, and no other further grant or patent is or was necessary. The issuance of a patent by the state in 1930 to the Westbrooks did not, in any manner, affect this statutory dedication to the city of Jackson. The patents so issued to the appellants are void.

The decree of the court below is approved.

Affirmed.