THE CITY OF ALTON, Plaintiff-Appellant, *v.* UNKNOWN HEIRS, DEVISEES OR ASSIGNS OF RUFUS EASTON, *et al.*, Defendants.—(ILLINOIS TERMINAL RAILROAD COMPANY *et al.*, Defendants-Appellees.)

Fifth District    No. 80-89

Opinion filed March 27, 1981.—Rehearing denied May 26, 1981.

Thad R. Carter, James E. Schrempf, and Robert E. Ryan, all of Alton, for appellant.

William J. Scott, Attorney General, and David Lincoln Ader, both of Chicago (Russell C. Grimes, Jr., Assistant Attorney General, of counsel), for appellees Robert H. Carroll and Sam Thames.

Mr. JUSTICE KARNS delivered the opinion of the court:

The plaintiff City of Alton appeals from the judgment of the Circuit Court of Madison County declaring that the use of lands in Alton for a proposed highway would be inconsistent with the dedicators' intent that grounds adjacent to the Mississippi River be used as a "common" or "promenade" and as a "landing." Robert Carroll and Sam Thames, citizens of Alton, and the Attorney General, on behalf of the general public, opposed the city's request for a declaratory judgment that the use of the premises for a highway was within the purposes of the dedications and that the city had the right to convey its interest in the premises to the State. Following a bench trial, the court denied the relief sought by the city and dismissed its complaint with prejudice.

In 1818, Rufus Easton platted the "Town of Alton." A portion of Easton's plat, which was attached as an exhibit to the city's complaint, is reproduced in this opinion. The city lies on the north bank of the Mississippi River which flows in a generally westerly to easterly direction at this location. At the southwest corner of the platted land is an area designated "ground for use of landing." Between Front Street and the river moving east from the landing ground are two blocks marked "reserved" and a larger area marked "common or prominade to be used in common."

1074

Copied from Record Book "C" Page 304 on Jan 16th 1908 and compared

J. A. France
Deputy Recorder

TRUE MERIDIAN

Variation 8°E

On this plat appears a "Memorandum and Condition" subscribed by Rufus Easton, stating as follows (without alteration of the original spelling):

"This town is laid out on the express terms and conditions that the exclusive right of Ferrying to and from the same is reserved to the undersigned proprietors of said Town, his heirs and assigns forever and the landing ground, streets, roads, Commons and ways to and from the river Mississippi are to be used as rights of way in Common only to all persons except as to the right of Ferrying as aforesaid which right and privilege of Ferrying or establishing or keeping of a Ferry or Ferries in said town cannot be acquired by any owner or purchaser or grantee of a lot or lots, or by any body politic or corporate or any person whatsoever but by purchase or discent from the proprietor, his heirs or assigns, and it is expressly understood that all streets, roads, commons and ground set apart for landing of vessels or boats or for loading or unloading or other publick use are laid out on the terms and conditions above expressed of which all persons will take notice."

In 1850, William Russell's Addition to Alton was platted of record. A copy of this plat was also attached to plaintiff's complaint as an exhibit. The lands in this addition lay along the river immediately to the east of the lands dedicated by Easton. On Russell's plat, an area several blocks long next to the river was designated "Public City Commons." William Russell subscribed the following dedicatory language:

"This instrument of Writing Witnesseth: That William Russell assignee of the Patentee of the Northwest fractional quarter Section Thirteen (13) of Township Five (5) North in Range Ten (10) West from the Third Principal Meridian, and owner thereof in fee simple, caused the same to be surveyed and laid off, into Blocks, fractional Blocks, Lots, Streets, Alleys, etc. on and prior to the 11th day of August A.D. 1837, and a Plat thereof to be made as above represented and shown, called 'William Russell's Addition to Alton which Plat will now be fully and legally authenticated and recorded for the purpose (with the explanations and certificate of the Surveyor thereon) of evidencing the size and locality of all the Blocks, fractional or parts of Blocks, Lots and fractional Lots, and also of the width of the Streets and alleys upon said fractional quarter Section and of the 'Public City Common,' on the River as represented by and upon the above Plat, all of which Streets and Alleys shall be and forever remain open Public Highways, and the said 'Public City Common', a public ground of the City, never to be owned as individual or private property."

The plat also contains Charles Hunter's subscribed statement that he was the owner of certain parcels represented in the plat and that he adopted the plat and annexed writings.

The strip of land between Front Street and the river has been greatly widened by both natural accretion and artificial means. Photographs and maps introduced by the parties show that the land is divided in use between park-like areas and playing fields and commercial uses which include railroad tracks and related commercial buildings, public parking lots, railroad and highway bridges leading over the river, and the federally constructed and operated Alton Lock and Dam.

The city's only witness was Charles H. Sheppard, a civil engineer since 1917, with extensive knowledge of the use and development of the land in question. Among the exhibits introduced by the city was a series of plats prepared by Sheppard's firm of sections of the proposed raised, limited-access highway. The highway would run roughly parallel with Front Street about 600 feet to the south and then curve toward Front Street and cross directly over the "ground for use of landing" near Front and Market Streets on Easton's plat. The highway would also cross over a small portion of the westerly block marked "reserved" on Easton's plat. Aside from these areas, the highway would be located entirely on grounds Sheppard testified consist of manmade fill. These grounds would include the park and playing field areas. The present distance from the intersection of Front and Henry Streets to the river is about 1300 feet. Moving westward, the land narrows, and the distance from the intersection of Market and Front Streets to the river is about 540 feet.

Sheppard also testified that opposite the intersection of Henry and Front Streets, the highway would be 5 feet high. The elevation would increase moving eastward to about 31 or 32 feet opposite the "reserved" blocks on Easton's plat. At this point, the right of way on the ground beneath the highway would be about 280 feet wide.

The city introduced and the court admitted deeds of Easton and Russell which make reference to their dedication of the landing and common areas. The court also admitted the city's exhibits consisting of a 1935 U. S. District Court order vesting title in the United States government of riverfront for the Alton Lock and Dam and a 1953 order of the City Court of Alton authorizing the city to install and operate parking facilities on Lincoln-Douglas square, which is substantially the same area as the "ground for use of landing" on Easton's plat. However, the court refused to admit city ordinances permitting construction of railroad tracks and various other uses.

A biography of Rufus Easton introduced by the defendants states that he was born in 1774 in Litchfield, Connecticut, where he began the study of law; he became a prominent attorney in Rome, New York; he

spent the winter of 1803-1804 in Washington, D.C.; he moved to St. Louis where he was appointed by Thomas Jefferson judge of the Louisiana Territory and postmaster of St. Louis; and he served as a delegate to Congress from the Territory of Missouri for four years after being elected in 1814. Defendants also introduced documentary evidence that Easton and Russell were partners and copies of 1818 Missouri newspapers containing advertisements placed by Easton for the sale of lots in Alton. The advertisements include the statement that "Front Street on the margin of the river is from 100 to 150 feet wide, and presents a beautiful promenade and view down the river."

Defendants' only witness was Rudy J. Favretti, a professor of landscape architecture at the University of Connecticut. He testified that landscape architecture involves the use of primary documents such as land records, wills, deeds, and other documentation of the type introduced here to restore authentically a landscape. In addition to teaching, he had published books and articles on landscape architecture and consulted in the restoration of properties dating from the 18th and early 19th century in New England, Great Britain, and the American South.

Favretti's opinion was that the terms "common" and "promenade" in Easton's plat meant that the land so designated should be used for recreational purposes. A major form of recreation at the time consisted of "airing" or walking. It was common in cities of the time to set aside an elongated area between a street and a river as a "promenade" for walking. These areas were often in the vicinity of landings. In 1818 the word "park" was still used to denote an enclosed piece of land not for public use, for example, George Washington's grounds at Mount Vernon. "Park" was not used in its current sense until the 1840's and 1850's.

In response to a hypothetical question that included facts concerning Easton's life and the Alton dedication, Professor Favretti gave his opinion that Easton intended that the land in question be used as a park, as presently known, having used the French word "promenade" which was in vogue at the time. Favretti also believed that Russell's intent in dedicating the "Public City Commons" along the river was substantially the same as Easton's.

The city's objection to Favretti's qualifications as an expert was properly overruled. The qualifications of an expert and the admissibility of his opinions are for the trial court's determination. Certainly no abuse of discretion can be found here. *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257.

Following trial, the parties submitted extensive briefs to the court. In a detailed and well-considered written order, the court denied the city relief and dismissed its complaint with prejudice.

The court found that in the previous and present litigation concerning

the lands in question, the fundamental issue has been and is to determine the intentions of the dedicators as to future use. The parties agree that this is the issue for the court's determination. The court noted that these were common-law dedications, be they for restricted or unrestricted uses, and as such are perpetual easements on behalf of the public.

After reviewing the contentions of the parties and authorities relied on by the city, the court reviewed the evidence it found persuasive regarding the intentions of the dedicators. The court noted that Easton's "Memorandum and Condition" distinguished commons from streets and roads; that Easton's plat designated the area as a "common or *prominade*" (emphasis added by trial court); that the designation of the area along the river on Russell's plat as a "Public City Common" appears to emphasize an intent that the use be for the public of the city; that a difference of intent as between "Streets and Alleys" and the "Public City Common" in Russell's plat is evidenced by his authenticating statement that "\* \* \* all of which Streets and Alleys shall be and forever remain open Public Highways, and the said 'Public City Common', a public ground of the City, never to be owned as individual or private property"; that a deed dated 1849, by which Russell conveyed to Hunter parcels in Russell's addition, includes a declaration that the strip of land between Front Street and the river and extending from Oak to Apple Streets in Russell's addition "\* \* \* is and shall be and Forever remain a Public Street, highway or common and *open public ground* dedicated & appropriated wholly to the uses of the public \* \* \*" (emphasis added by trial court); and that Professor Favretti testified that the word "promenade" as used by Easton in his plat and advertisements meant public walking place in the nature of a park, while the city offered no evidence of any other construction of this word.

Following a discussion of previous litigation concerning the premises in question, the court concluded that the dedications were restricted in nature and that any use as a general State highway would be in violation of the dedicators' intentions. We too find that previous supreme court decisions constitute some precedent on the controlling issues in this case.

*City of Alton v. Illinois Transportation Co.* (1850), 12 Ill. 38, held that the two blocks between Front Street and the river marked "reserved" on Easton's plat were dedicated to the public along with the "ground for use of landing" and the "common or prominade."

*McPike v. Illinois Terminal R.R. Co.* (1922), 305 Ill. 298, 137 N.E. 235, held that a lease of a portion of Russell's "Public City Commons" entered into by the city council and the plaintiff for an unspecified private use was invalid as contrary to Russell's dedication to the public, and, therefore, the lease afforded the lessee no basis for seeking an injunction to prevent a railroad from building track on the leased premises. Noting that the master in chancery had concluded that the railroad's franchise was valid,

the supreme court commented that "[n]othing in this opinion is to be taken as sustaining the view of the master in that regard."

*Streuber v. City of Alton* (1925), 319 Ill. 43, 149 N.E. 577, confronted the issue of whether the "ground for use of landing" in Easton's dedication was a dedication for a particular use prohibiting the location of the Alton city hall on this ground. About 60 or 70 years prior to *Streuber*, the city had constructed a city hall three stories high, 110 feet long and 45 feet wide, on a portion of Easton's landing ground. There it remained until destroyed by fire in 1923 or 1924. The mayor and city council sought to proceed with reconstruction. However, the State's attorney on relation of four Alton taxpayers filed suit to enjoin the reconstruction. *Streuber*, citing *McPike, Illinois Transportation Company*, and other cases, held the injunction proper, applying the rule that an owner making a dedication of land to the public has the right to specify the particular use to which the land is to be devoted and to impose such restrictions as he sees fit on such use. Land so dedicated cannot be applied to any other use, nor can the restrictions be destroyed. The court so held even though accretions to the tract and the receding of the river had more than doubled the size of the original "ground for use of landing," and the area had been graded and paved and was occupied by railroad tracks, two passenger stations and an interurban traction line, as well as the city hall.

*Streuber* held that Easton's dedication of the landing ground was a dedication for a particular purpose and that the city, as trustee of the property, must be prohibited from allowing a contrary though clearly public use, in an action on behalf of the public to enforce the dedication. Therefore, if for no other reason, we are bound to disagree insofar as the city contends that the dedications placed no restrictions upon the type of public use to which the Alton corporate authorities could devote the lands. *Streuber* also makes it apparent that the city's responsibility to the dedicators' intent is not vitiated by the fact that arguably contrary uses have been allowed and continue to be maintained, unchallenged, on behalf of the public. Here, as in *Streuber*, the public interest has been asserted by the State, and the issue is whether the proposed use would be contrary to whatever particular uses were intended by the dedicators.

The city relies on *Goode v. City of St. Louis* (1892), 113 Mo. 257, which held that the dedication of land adjacent to a river as a "common," without more, did not restrict the area to park-like uses, to the exclusion of wharves and a railroad line. Noting that the plaintiffs were seeking a reversion of the lands involved rather than enforcement of the dedication, *Goode* also denied them relief on evidence that the lands could still readily be converted to a park and on estoppel by failure to object for nearly 40 years while the city went to great expense to convert the ground to a square and wharf.

■■ We recognize that generally the term "common" is distinguishable

from the term "park" and possesses a more comprehensive meaning. (15A C.J.S. *Common Lands* §1 (1967).) However, standing alone, the term "common" is ambiguous, since the kind of enjoyment, and for what persons, cannot be understood without more, although the surrounding circumstances may be sufficient to remove the ambiguity. 15A C.J.S. *Common Lands* §1 (1967).

■■ As determined by the trial court, Easton's use of the word "promenade" on the plat together with the word "common" suggested that a park-like use as a walking place was intended. (*Jones v. City of Jackson* (1913), 104 Miss. 449, 61 So. 456.) This conclusion is consistent with Professor Favretti's testimony and with Easton's own contemporaneous advertisements describing the "* * * beautiful promenade and view down the river." *Village of Riverside v. MaClain* (1904), 210 Ill. 308, 71 N.E. 408, held that a municipality had no authority to extend a highway across a tract of ground dedicated as a "park and common." While the intent to dedicate the land as a park is not as clear here, we believe that Easton's intent to create a park-like public walking place was sufficiently demonstrated by the defendants to invoke *MaClain.*

The city argues that Easton's intent to dedicate the common and the landing ground for use as a highway is apparent from his use of the phrase "rights of way" in the dedication, as follows:

> "* * * the landing ground, streets, roads, Commons and ways to and from the river Mississippi are to be used as rights of way in Common only to all persons except as to the right of Ferrying as aforesaid * * *."

However, the only intent apparent from reading this passage as a whole is that the public have the right to enter upon and use various described areas according to their nature, with the exception that the right of ferrying be reserved to the proprietor. The general statement that the common was to be used as a right of way to all persons did not alter or dilute the effect of the more specific designation of this area as a common or promenade.

The construction of the proposed raised, limited access highway would obviously create a far greater obstruction of the "ground for use of landing" than the city hall prohibited in *Streuber.* It would also destroy any possibility for the pleasurable use of any part of the common or promenade as a public walking place, along with the other park-like uses currently being maintained. Nor can the argument that the highway would merely change the method of the use to conform to modern transportation facilities prevail over the conflicts with the dedicator's intent. We need not review here in detail the matters pertaining specifi-

cally to William Russell's dedication, where it is undisputed that his intent in dedicating a common was substantially the same as Easton's.

The judgment of the Circuit Court of Madison County is affirmed.

Affirmed.

KASSERMAN, P. J., and HARRISON, J., concur.